JOAN BERNARD ARMSTRONG, Chief Judge.
| T STATEMENT OF THE CASE
The defendant, Christopher Marlowe,[1] was charged by bill of information with attempted second-degree murder, by shooting, of Erik Beelman[2], a violation of La. R.S. 14:27, 14:30.1. The defendant pleaded not guilty at his December 6, 2006 arraignment. The defendant waived motions on April 25, 2007. The defendant was tried on June 15-16, 2009, by a twelve-person jury, but a mistrial was declared after the jury was unable to reach a verdict. The defendant was retried by a twelve-person jury on September 21-24, 2009, and found guilty as charged. The defendant was sentenced on November 19, 2009, to twenty years at hard labor, without benefit of probation or suspension of sentence. The defendant now appeals raising five assignments of error.
| ¡.FACTS
The shooting occurred on June 27, 2006. New Orleans Police Department Assistant Police Communications Supervisor Andrea Taylor identified incident recall item number F-2728906, and the associated 911 audio recording.
New Orleans Police Department Crime Lab technician Aven Cooper processed the scene of the shooting on June 27, 2006, at the Royal St. Charles Hotel, located in the 100 block of St. Charles Avenue. Cooper identified numerous photographs she took of the scene. She collected one spent Win- *949 Chester .40 caliber Smith & Wesson cartridge casing in the 100 block St. Charles Avenue; one black blood stained night stick located on the ground in the street, near the sidewalk; one belt buckle located on the sidewalk, near the blood; and one “Sea Hawk” knife located on the ground in the street. Cooper testified on cross examination that Officer Defillo was the investigating officer at the scene. Cooper did not submit anything for blood analysis, fingerprints, etc., nor was she ever directed to do so by an investigator.
New Orleans Police Officer Terrell De-fillo testified that he responded to the shooting. He observed one white male lying on the ground at the northeast corner of the intersection and another white male (the defendant) standing over him. The defendant was dressed in a white shirt, black BDU trousers and a gun belt with a holstered gun. Officer Defillo asked the defendant what was going on, and the defendant said, “I shot him.” When asked whether the defendant said he had been beaten, Officer Defillo said defendant said he had been pushed. Officer Defillo further elaborated, “That was his initial statement. If I recall correctly he said, ‘He pushed me so I shot him.’” The officer observed no bleeding or bruising on the |sdefendant. The defendant did not complain to the officer of any injuries. The defendant was the first person to whom Officer Defillo spoke, and the officer was the first officer to arrive on the scene. After the defendant made the aforementioned initial statement(s), Officer Defillo advised him of his Miranda[3] rights and did not talk to him anymore. Officer Defillo identified the firearm, cartridges, and magazine he confiscated from defendant, as well as the defendant’s gun belt, flashlight, and handcuffs. He identified clothing the defendant was wearing on the night of the shooting. An EMS unit arrived on the scene almost simultaneously with Officer Defillo. The defendant did not make any requests for treatment or assistance. Officer Defillo’s role in the investigation concluded after taking witness statements and placing the defendant under arrest for aggravated battery.
Officer Defillo confirmed that there was nothing unusual about the defendant’s handcuffs, his gun, his flashlight, or his duty belt for a security officer or police officer. Officer Defillo said one piece of evidence, a shirt with a label reading “American Maritime Protection Service,” was in the street on the scene.
Meredith Acosta, a firearms examiner for the Jefferson Parish Sheriffs Office Crime Lab, testified that she conducted an analysis in connection with a shooting in the 100 block of St. Charles Avenue, under item number F-27289-06. She examined one spent .40 caliber cartridge case and a Springfield Armory, Model SP40, .40 caliber semi-automatic pistol, and determined that the casing had been “fired” by the pistol.
14Philip Barbarin was working on the night of the shooting in the instant case for Downtown Parking as a supervisor for an overnight valet crew. One of his assigned locations was the Royal St. Charles Hotel at the corner of St. Charles Avenue and Common Street. He identified the defendant in court, confirming that the defendant was a little smaller in terms of weight than he had been at the time of the June 2006 shooting. Barbarin testified that the defendant began working at the hotel approximately two weeks before the incident occurred. Barbarin did not know the victim, except from that night. On the night in question, Erik Beelman, entered the hotel with a female, talking. Barbarin said *950 Beelman seemed to be very, very jolly, and went up into the hotel with his companion. Barbarin did not hear anything said between the defendant and Beelman when Beelman came into the hotel. Barbarin replied in the negative when asked whether Beelman was being aggressive toward anyone, was standoffish or hostile towards anyone, or was cursing or using foul language.
Barbarin testified that when Beelman came down and was leaving the hotel, Bar-barin said something to him, and the two men started a conversation. The front desk people and others also began conversing with Beelman. Barbarin also heard Beelman telling the defendant about what a “bad mother f-er” Beelman’s brother, a police officer who had been injured in a shoot-out, was. Beelman was not being confrontational. Barbarin went to do some paperwork, and at some point he realized that Beelman and defendant were outside and were engaged in “sort of an argument.” Barbarin testified that, as he recalled it, the defendant was telling Beel-man that he, the defendant, was also a “bad f-er and in the military.” The defendant “just started getting a little rude” toward Beelman. Barbarin replied in 1¡¡the negative when asked whether, up to that point, Beelman had been confrontational at all toward the defendant.
Barbarin said others present were hyping up the defendant to get into a fight with Beelman. “So, you know, [defendant] was like, man, you know, get the f~k up the street.” Beelman’s female companion grabbed Beelman to move on. The defendant was coming toward Beelman, telling him to move on up the street. Barbarin said Beelman was “like, dude, what is your problem, man. What is wrong? Man, what’d I do to you? So he is steady going at him, get the F up the street.” The defendant repeatedly struck Beelman with his night stick. Beelman would block the blows, asking defendant what his problem was. When Barbarin was asked whether, up to that point, he had seen Beelman push the defendant, punch him, kick him or spit on him, Barbarin replied that Beel-man never “threw a lick”; he never did anything. Beelman was backing up, and when they were in the street the defendant pulled out a gun and told Beelman to get on the ground. Beelman threw his hands up “like, whoa, whoa, whoa, whoa,” and Barbarin said at that point he went back inside the hotel to tell the front desk to call the police because the defendant was about to shoot Beelman. Barbarin said that as soon as he said to the front desk attendant that the defendant was about to shoot Beelman, he (Barbarin), turned around and the defendant shot Beelman in the face. Barbarin was the first person to render aid to Beelman. He identified the shirt he was wearing that night and had taken off to hold to Beel-man’s face after Beelman was shot. Another individual, a guest from the hotel, also gave his shirt to use.
The defendant was standing over Beel-man, and Barbarin asked him why he shot Beelman. Barbarin testified that at that point the defendant threw a knife on the ground. Barbarin identified the knife in evidence and a photograph of the 1 scene where he and Beelman sat on the ground after Beelman was shot. Barbarin identified on another photograph the location where Beelman was first shot and the location where he staggered to afterward and collapsed. Barbarin identified on a third photograph where he was sitting on the ground with Beelman and where the defendant threw the knife down.
Barbarin confirmed that he twice met and discussed his testimony with civil attorneys for Erik Beelman. Barbarin initially denied ever viewing a video clip at *951 either of those meetings, but later said he recalled seeing a video shown to him by Beelman’s civil attorney. Barbarin confirmed that he had never given a recorded statement to police or prosecutors or a statement that was typed up for him to sign. Barbarin said he was not certain where Beelman and the defendant wére when they were talking about Beelman’s brother having been a police officer and having been shot in the line of duty. Bar-barin did not recall Beelman telling the defendant that his (Beelman’s) brother had also been a bad dude in the military. Bar-barin recalled Beelman’s companion telling Beelman, “let’s go, let’s just go.”
Barbarin implicitly confirmed on cross examination that at the point in time that he went back inside the hotel to ask the desk clerk to call the police because he believed the defendant was going to shoot Beelman, the defendant and Beelman were at the corner of Common Street. He said the door of the hotel was at least twenty-five feet from the corner where everything happened. Barbarin confirmed that it was his testimony that Beelman had his hands up when Barbarin left the scene to return to the hotel, and that after he walked into the hotel lobby and turned to look out the window, Beelman still had his hands up. Barbarin confirmed that he had testified, and maintained that former testimony, that the defendant had pointed the gun at Beelman and that he thought the defendant was going to shoot |vBeelman. Bar-barin confirmed that he did not see the defendant walk to his truck. He confirmed that he was not sure whether Beel-man was talking about his brother inside the hotel or outside.
On redirect examination Barbarin replied in the affirmative when asked whether he saw Beelman get shot. He said Beelman was not moving toward the defendant at the time; rather, the defendant was moving toward Beelman.
Erik Beelman admitted that ten or so years ago he was convicted of possession of a controlled dangerous substance known as Ecstasy. Beelman testified that on the day in question, he walked in with a guest of the Royal St. Charles Hotel. He said some people who worked there — including the defendant, a person behind the front desk, and some others in regular clothes— greeted him and that he greeted them in return. He did not know who any of them were at the time. He said he also heard snickering and laughing from those persons, who were around the front desk. Beelman said he did not know if the snickering and laughing had been directed towards him. Beelman and his companion passed by the group and went upstairs on the elevator. Beelman said he was only upstairs for a minute or two, because he got a call on his cell phone and had to leave to meet someone who was going to do some work on his apartment. When Beelman went back downstairs to the hotel lobby, he was still talking on his cell phone. Beelman said that when he returned to the lobby, the defendant was leaning on the concierge desk. Beelman again heard some laughing and also a derogatory comment. He said he looked, shrugged it off, and kept carrying on his cell phone conversation. Beelman said there were two entrances/exits to the hotel, one on Common Street and one on St. Charles Avenue. He and his companion walked through the lobby | ^toward the St. Charles Avenue doors. However, there was some obstruction, and they turned around and went towards the Common Street exit.
As Beelman and his companion walked back through the lobby, there was some more laughing and derogatory comments, and defendant told Beelman to “get the f— *952 out of there.” Beelman said he threw up his hands, gesturing “like, what?” Beel-man said he realized they had been laughing at and making comments about him the entire time. Beelman said he pointed at the guy sitting behind the counter laughing, and “basically said to him, ‘What the hell y’all laughing at. I’m not doing anything. Y’all over there talking trash. That ain’t right.’” Beelman said he recalled that “he” told me to leave again, to get out. Beelman said, “ ‘Who the hell are you, man? You work here and you’re talking trash to me. You don’t know who I am. Screw you,’ and I left.” Beelman walked out the Common Street door and took a left towards St. Charles Avenue. Beelman said he had made it approximately one-half way from the door to St. Charles Avenue when Philip Barbarin came out apologizing. The two men talked briefly, and then the defendant came out the Common Street door and went to his truck, which Beelman said was parked on the street directly across the sidewalk from the Common Street hotel door.
Beelman said the defendant opened the door of his truck, reached in and grabbed something, and walked briskly over to him. When asked whether he began moving in the defendant’s direction when the defendant went to his truck, Beelman said he might have taken a step to the side, put his hands up again, apparently meaning in a gesture, and put his hands on his hips in a non-threatening manner. When the defendant came up to him, he said to the defendant, “Look, man, I wasn’t doing anything in there.” He asked the defendant if he was in the 19military, and then the two started talking about the military, about Beelman having had friends who went to Iraq, and about the fact that Beelman’s father and his brother were both Marines. Beelman said he then mentioned to the defendant that his brother had been shot on a SWAT roll last week, a story that had been all over the news. Beelman said the defendant turned to walk off, and turned back to say, “f — your brother.” The defendant then walked off past Beelman, toward St. Charles Avenue. Two of the other males who had been in the hotel came outside and walked up. One stood behind the defendant. Beelman said at that time he believed something was about to “go down.” Beelman testified that at that point he walked toward the defendant. Beelman denied hitting, pushing or spitting on the defendant.
Beelman said the defendant kind of postured himself up and had his ASP (baton) in his hand. Beelman identified the ASP in evidence. Beelman testified that the defendant extended the ASP, pointed down the street, and said, “Go ahead on. Get up the street.” Beelman stated that he said, “Wait a second, man.” He said he believed that at that point he took a step back or kind of stepped to the side and said, “Whoa. Hold up.” Beelman said he put his hand on a road construction barrel on the sidewalk located towards the corner of St. Charles Avenue and Common Street and said, “Whoa. Wait up, man. Hold up. I’m not doing anything.” He said that as soon as he displaced his weight onto the barrel and kind of put his feet together, the defendant hit him with ASP. Beelman identified a photograph in evidence of the construction barrels. Beelman testified that he flew back into the street, and the defendant started coming at him, “boom, boom, boom.” Beelman said he took a couple of blows, and that he was just trying to get distance between him and the defendant. He pushed the defendant back with his |inhand. Beelman said that because he was trying to get distance between him and the defendant, they ended up almost across the street. He said there was approximately eight feet between him and the defendant. He said he “was like, *953 ‘Dude, what are you doing, man? What the f s your problem?’ And then he pulls out his gun and walks up to me, boom, shot me, tried to blow my head off. Plain and simple. That’s it.”
Beelman said that after he was shot he blacked out, came to, had a loud buzzing sound in his head, and that everything was spinning. He realized what had happened, and he saw the defendant walking toward him. He said his mouth was hanging, that the roof of his mouth was on his tongue, and he was trying not to swallow it. Blood was going down his throat. He grabbed his cell phone and attempted to call 911. He said someone came over and took off his own (the other person’s) shirt, put it on Beelman’s face, and tried to calm Beelman down. He identified the shirt worn by Philip Barbarin, the hotel employee who came outside to attempt to diffuse the situation and apologize. That shirt and another one were on his face when he was transported to the Elmwood Trauma Center. Beelman viewed a surveillance video, pointed out individuals involved, and narrated the events recorded.
Beelman stated that when he walked into the hotel that morning at about 7:00 am, he had been out at bars since approximately 9:30 or 10:00 p.m. the night before and had had drinks. He was at the Maple Leaf until 1:00 or 2:00 a.m., then went to Friar Tucks bar, and then to the French Quarter. He met the female companion he was with at the hotel that morning in the French Quarter. Beelman denied attempting to use an ATM, or automated teller machine, located in the bar area of the hotel lobby. When asked whether the defendant was laughing when |nBeelman came back through the lobby, Beelman replied, “Probably.” He said the individual the defendant was talking to definitely was laughing. When asked whether the defendant said anything to him at that point, Beelman said that eventually the defendant told him to “get the f... out of there.”
However, Beelman admitted that when giving testimony under oath on March 4 and 5, 2008, he had said he could not recall exactly what was said. Beelman admitted pointing his hand at the person behind the hotel front desk, and then pointing at his chest and saying something like, “You don’t know who you talking to. Screw you.” Beelman admitted he was upset. When asked whether that was all he said, Beelman admitted there were other words, that he said something to the effect of, ‘Y’all siting back there and shouting things and y’all work here. Who the hell do you think you are? Y’all work here. Screw you. You don’t know who I am. Screw you.” Beelman admitted that he may have said, “What the fuck’s your problem?” Beelman confirmed that his female companion was pulling on his arm to get him to leave the hotel. But he said his intent upon leaving was to go, meet his employee, and let him start on his work. He intended to walk up St. Charles Avenue and cross over into the French Quarter, where his car was parked. Beelman conceded that he may have taken a step toward the defendant.
Beelman was asked how long the conversation between him and the defendant lasted, the one after the defendant returned from his truck, when Phillip Barba-rin and Beelman’s female companion were present. He said it lasted a minute or so. Beelman was facing the defendant, within arm’s reach. He said the defendant had something in his hand at the time, but he could not tell what it was. He did not recall the defendant threatening him, but said the defendant may have made a derogatory comment toward him. The defendant did not extend the ASP |iabaton until the defendant reached the corner. *954 Beelman said he pushed the defendant and that the defendant may have fallen, but not to the pavement. Beelman conceded that he might have punched the defendant when he was trying to get separation between himself and the defendant, as the defendant was striking him with the baton. However, he said that he did not think it was an all-out punch. He was not sure how many times he contacted the defendant with his hands. Beelman conceded that he was in good physical condition at the time and that he had generally been working jobs that had a physical labor component to them that helped keep him in good physical condition. He also conceded that he had played football in the Southeastern Conference as a linebacker.
When asked whether at any time he had acted aggressively toward the defendant, Beelman stated that he had been offended, and he conceded that his actions could have come off as aggressive. Beelman said he was referring to him walking toward the defendant after the defendant said “f... ” Beelman’s brother, after Beel-man had said something to the defendant about his brother, a Jefferson Parish Sheriffs deputy, having been shot in the line of duty. Beelman replied in the negative when asked whether he had taken any other aggressive acts toward the defendant between the time he left the hotel lobby and the time when the gun discharged. Beelman denied that when he pointed to the defendant and then pointed back at himself on a video that he was inviting the defendant to fight. Beelman denied attempting to take the defendant’s gun out of its holster. Beelman admitted he had a pending personal injury suit arising out of the shooting.
11sThe trial court conducted a Daubert[4] hearing on September 22, 2009, concerning the proposed testimony of Greg Meyer as an expert in the field of the use of force in lethal and non-lethal violent encounters. At the conclusion of the hearing the trial court pretermitted decision until the following day. Prior to the start of the third day of trial on September 28, 2009, the trial court ruled that Meyer would not be permitted to testify as an expert in the use of force in lethal and non-lethal violent encounters. The trial court later granted defense counsel’s request to proffer what the expert opinion testimony of Meyer would have been.
Dr. Bruce Wainer, called as a defense witness, was qualified by the court as an expert in the field of forensic pathology and neuropathology. Dr. Wainer reviewed Beelman’s medical records. He said Beel-man’s blood alcohol level was 0.253, in the range of severe intoxication, which he said was 0.2 to 0.8. He noted that the legal blood alcohol limit for operating a motor vehicle is 0.08. Dr. Wainer said that it was his opinion, within a reasonable degree of medical certainty, that there would be significant memory impairment in the range of 0.15 to 0.29 blood alcohol level. He said a person’s recollection of an event occurring under that degree of intoxication may be distorted and inaccurate. Dr. Wainer referred to a phenomenon called confabulation, when a person has a memory deficit and so makes up a fantasy that sounds credible but is, in fact, inaccurate. He said that confabulation was a medical condition that was a symptom and sign of chronic alcohol degenerative brain disease, but that it was possible it could occur with a single episode of severe intoxication.
*955 114Pr. Wainer also described the “fight or flight” syndrome that could affect perception of such things as recollecting the chronological time of events. He said it was his opinion that, considering Beel-man’s level of intoxication, Beelman’s fight or flight reaction time and coordination would have been diminished or slowed, but that his state of agitation would have been more heightened than if he had not been intoxicated. Viewing a photograph of Beelman’s face after he had been shot, he said that he did not see any evidence of stippling — partially burned gunpowder particulate matter residue that enters the skin, resulting from a firearm fired anywhere from two inches to twenty-four inches away. He confirmed that if medical intervention had not eliminated stippling caused by a contact gunshot wound, he would have expected to see such stippling if there had been a contact gunshot.
The defendant, Christopher Marlowe, testified that he was twenty-one years old at the time of the incident and was working at the time for American Maritime Protection and Security. He was not an employee of the Royal St. Charles Hotel. The night of the shooting was his third night on the job at the hotel. Marlowe had never fired a weapon at anyone while he was in the military. He had never been convicted of a criminal offense. That night he was working the 11 p.m. to 7 a.m. shift for another security guard. His job duties included telling people loitering about the outside of the hotel to leave. The incident in question occurred about ten minutes before he was scheduled to go off duty. There had not been any disturbances that night, nor on the two previous nights. He had never seen Beelman before that night. The main entrance to the hotel was on Common Street; people did not come and go through the St. Charles Avenue door.
| isThe defendant replied in the negative when asked whether there was any conversation when Beelman and his companion first walked into the hotel and went to the elevator. When the two came down the defendant was talking to the desk clerk. Neither Beelman nor his companion was the subject of any part of the conversation. The defendant said he was laughing at something in the conversation. Beelman’s companion went toward the St. Charles Avenue door to use an ATM, which the defendant said was broken, and Beelman followed her. The defendant said that when the two walked back toward the Common Street door, Beelman got loud and belligerent, and defendant told him he needed to leave. He said Beelman pointed at him, “like more or less come get some.”
Beelman then left, when his companion was pulling on his arm. The defendant replied in the negative when asked whether he ever left the counter to approach Beelman. The Defendant said he was getting ready to get off work, and he went out to his truck to get his cell phone and call his boss. His cell phone had been charging in his truck. He said that, from watching the video of the events, he knew that he had left the hotel some twenty seconds after Beelman left the hotel. When the defendant exited Beelman said, “Hey, hey, you.” The defendant asked him if he had been in the military, “You were in the Army, huh?” The defendant said he walked toward Beelman, and Beelman asked him if he was in the Army. The defendant replied that he had just gotten out. Beelman said his brother and father had been Marine Recon. The defendant vaguely stated that something then happened, and he did not recall the next word, but Beelman said, “I bet you’re scared now, huh, bitch?” The defendant said he decided to ask Beelman where he went to training, and Beelman “was just like ‘Yeah,’ ” so he walked around Beelman and *956 left, ending the conversation because it had gotten “really weird.”
11fiThe defendant said he told Beelman to have a nice day and walked to the corner. The defendant said he noticed alcohol on Beelman’s breath, and that Beelman was talking loudly. The defendant denied ever talking to Beelman about Beelman’s brother being a Jefferson Parish Sheriffs deputy, and he denied every saying “F— you” and “f — your brother” to Beelman.
The defendant walked to the corner, sat down on a city trash can, pulled out his knife, and started cleaning his fingernails, something he indicated he used to do in the Army when he had nothing to do. The defendant said he threw down the knife when Beelman subsequently walked up to him. The Defendant said Beelman got very close to him, and Beelman had both of his fists balled up. The defendant said he forgot what Beelman was saying, but the defendant told him again that he had to leave. Beelman said, “Make me.” The Defendant said that at that point he stood up and told Beelman to leave. The Defendant said he was face to face with Beel-man, so he walked around him and said, “Get the fuck out of here.” Beelman shoved him. He shoved Beelman back. They moved toward the corner, and Beel-man punched him in his left ear, almost knocking him down. The defendant responded by pulling his ASP out, because Beelman was attacking him and had punched him in the head. The defendant said his ASP was on his duty belt, right behind his gun.
The defendant said he extended his ASP and hit Beelman twice, once on the shoulder and once on the arm. He said Beel-man shrugged off the strikes like nothing had happened, and he would not stop attacking the defendant. Beelman grabbed the defendant’s ASP and tried to yank it out of his hand. The defendant said that scared him, and so he tossed the ASP into the street. He then put his hand on the grip of his gun and told Beelman to freeze, to stop. Then he put his hand 117down, off the gun. Beelman did not stop. Instead, he charged the defendant, saying, “I’m going to get your gun from you, Mother Fucker.”
The defendant said that at this point he was scared out of his mind, and he indicated that he did not have the ability to handle Beelman. He noted that he had broken his back in the military and had bad knees, and that Beelman said he had been an Army Ranger. Beelman charged him, and the defendant said all he felt was Beelman’s hands grabbing him and the next thing he knew, “Bang.” He did not recall the instant the gun went off, although he said he was struggling with Beelman at the time it went off. He did not recall pulling the gun out of its holster. The defendant said he did not intentionally pull the trigger, and that he had not wanted to hurt Beelman.
He rushed Beelman back to the hotel side of the street, took off his own uniform shirt, put it on Beelman’s face, and called an ambulance. The defendant identified that shirt and said he had gained approximately sixty pounds since the shooting. The defendant said he tried to lay Beel-man down, but Beelman kept wanting to sit up. He said he called 911 twice, and that Officer Defillo arrived while he was talking during the second call. The defendant replied in the negative when asked whether he had been drinking any alcohol during his 11:00 p.m. to 7:00 a.m. shift or had consumed any kind of narcotics or drugs prior to going on his shift.
The defendant was questioned on direct examination concerning the hotel videos. The first one began after Beelman and his companion had exited the hotel elevator after having gone up and come right back *957 down. Approximately one minute into the video Beelman and his companion were shown walking back from the ATM on the St. Charles Avenue side of the hotel. The defendant said the video 11sshowed him and the desk clerk having a conversation. The desk clerk was laughing loudly. The defendant noted a hand motion he made in the video and said that was when he said to Beelman, “Yeah, you go ahead and leave.” The video next showed the defendant going to his truck, at 51.12 minutes. Another camera, with a view from the hotel lobby looking outside toward Common Street, showed Beelman’s female companion outside the hotel at 50.29 minutes, with Beelman pointing at the defendant or him and the desk clerk, saying something. Another view showed Beel-man, as the defendant characterized it, being “drug out” of the hotel by his female companion, with Beelman pointing at his chest.
Beelman was out of the hotel by 50.49 minutes. The defendant pointed to a place in the video where he and Beelman were almost back-to-back, with defendant saying he was walking away from Beelman at that point. The defendant said that was after Beelman had come over for a conversation. At 52.55 minutes the video showed defendant and Beelman, with Beelman’s female companion between the two men. The defendant said the female was saying, “Let’s go.” At 53.36 Beelman’s companion was coming back out to tell Beelman, “Let’s go, leave. What are you doing?” At 53.56 the defendant’s left arm was extended, where, he admitted, he was saying, “Get the fuck out of here.” The defendant said minute 54.02 from camera 15 was where he had been hit by Beelman, had almost fallen down, and had drawn his baton. None of the cameras caught the moment when the defendant’s gun was fired. The defendant said he never pointed the gun at Beelman.
The defendant identified his cell phone record showing two 911 calls he made that morning. The first did not go through. In the second call he said he requested an ambulance and then next told the operator that he had just shot the 11flinjured person.' He indicated that he told either the- 911 operator or a police officer that it “was my discharge,” which he said meant that-it was his gun and not someone else’s. When asked whether he intentionally shot Beelman, the defendant replied, “Absolutely not.” When asked whether he had wanted to hurt Beelman, the defendant replied, “No, sir.”
On cross examination, the defendant admitted that the defense transcript of the second 911 call was inaccurate in omitting someone saying, “Hold on, hold on. Here.” When asked if it was correct that whether that “Here” meant that someone was handing him the phone, the defendant replied that he did not believe that was why “Here” was said. The defendant conceded that the defense transcript of the 911 call did not reflect that right after he said he needed an ambulance he said, “This guy tried to hit me.” When asked whether he heard that on the 911 recording, the defendant said he believed he might have heard that. The defendant confirmed that he was the person who told the 911 operator that the guy tried to hit him. However, the defendant replied in the negative when asked whether it was true that Beelman never hit him or tried to hit him. When asked why he told the 911 operator that Beelman “tried” to hit him, the defendant replied that in the rush of things he could not recall anything. The defendant conceded, with regard to his claim that he went to his truck to get his cell phone during the sequence of events preceding the shooting, that his cell phone was on his person at 4:55 a.m. that morning, at 12:58 a.m., and at 3:09 a.m.
*958 The defendant testified further on cross examination that his handgun was never out of its holster. The defendant handled the handgun while on the witness stand, exhibiting the grip safety on the gun’s backstrap that had to be depressed in order for the gun to fire. The defendant said his hand was on the grip of the gun, |20but-that the gun was in its holster. The defendant confirmed that the gun had to have come out of the holster for Beelman to have been shot in the face with it, but the defendant did not remember taking it out of the holster or firing it. He said the gun “somehow came out and then the struggle.” When asked later if it was “our testimony that that gun was wrestled from you from that holster, right?,” the defendant replied, ‘Tes.”
The defendant demonstrated how it happened for the jury, saying that he told Beelman, “Freeze, stop, freeze.” The defendant stated further, “He comes. This thing’s out, his hand’s up. He’s coming and he’s also reaching by his head. He’s got — hands are going, it’s going, and it comes out.” The defendant conceded that he had not told Officer Defillo, the first officer to arrive on the scene, that the gun went off accidentally or that Beelman had been trying to take it from him.
The defendant conceded that the gun went off approximately ten inches from Beelman’s face. The defendant replied in the negative when asked whether he had had use of force training or anything similar as a security guard. When asked why he believed he could beat and shoot Beel-man, the defendant replied that he was defending himself.
Dr. Alvaro Hunt, senior forensic pathologist with the Orleans Parish Coroner’s Office, was called as rebuttal witness by the State. He was qualified by the trial court as an expert in the field of clinical, anatomical, and forensic pathology. Dr. Hunt testified that, based on the absence of any indication in Erik Beelman’s emergency room/hospital records of gunpowder stippling or soot, and the absence of any indication of such soot/stippling in photographs of Erik Beelman’s wound, it was his opinion the gun had been fired from a distance of two feet or more. Dr. Hunt could not say how Erik Beelman’s blood alcohol level of | ⅞10.253 had affected him. He did not think combining Red Bull energy drink with alcohol would have had much in the way of an effect on the alcohol in Beelman’s system.
Dr. Hunt stated on cross examination that at a 0.253 blood alcohol level one would be past the point of loss of inhibition. He agreed that at that level one’s inhibitions are gone; that a level of 0.253 would affect a person’s ability to tell right from wrong; that at that level one would be likely to get into situations he might not have found himself in had he been sober; and that at a 0.253 blood alcohol level a person might act in ways that would not normally be within their character. Dr. Hunt saw nothing in Beelman’s medical chart that would give him any reason to believe Beelman would have reacted any differently than an average person with a 0.253 blood alcohol level. With regard to gunpowder soot deposits being on Beel-man, Dr. Hunt agreed that it would be reasonable to assume that, had there been soot present, it may well have been cleaned when Beelman was cleaned very well in the hospital.
Dr. Hunt opined that with a 0.253 blood alcohol level one would have problems remembering things from the point of intoxication to that degree. He also confirmed that one’s recollection might be very skewed for rapidly occurring events during a fight or flight experience. Dr. Hunt also confirmed that there was insufficient data to definitively say that the defendant *959 raised his arm and fired a level shot into Beelman.
On redirect examination, Dr. Hunt testified that, in a situation where a gun is fired within ten inches from someone’s face, it is not unusual to get hot burning particles that would burn the conjuncti, the lining of the eye, causing bleeding into the eye and extensive swelling of the soft tissues of the eye itself. He confirmed | ¡>athat in such a case one would expect to see burning from the soot on other parts of that person’s face. His review of Beel-man’s medical records revealed none of those types of burns on Beelman, or any burns on his hands either. As for the effects of a blood alcohol level of 0.253, Dr. Hunt testified that once one gets above 0.25, many people begin to get so overwhelmed by the sedative effects of alcohol that they basically become immobile He noted, however, that there was the so-called “aggressive” or “mean” drunk who becomes unusually aggressive when he begins to drink, the sort of person who picks barroom brawls. But, he said, once one gets above 0.253 blood alcohol level the sedative effects of the alcohol on the brain have begun to take effect and, while one might try to pick a fight, in his opinion he did not think the person would be very successful because of the central nervous system effects of alcohol.
On recross examination, Dr. Hunt agreed that it was possible a 0.10 or 0.20 blood alcohol level might cause decreased pain sensation such that one might continue to fight even after being struck with a baton. When asked whether in the New Orleans Coroner’s Office he routinely tests for gunshot residue the hands of decedents who are autopsied and who may have fired a handgun, Dr. Hunt replied that the office did not. He stated that it costs over $2,000.00 to have the test done and that the test was unreliable because one might not have been in contact with gunshot residue for weeks but the test will come back positive. He said that a lot of law enforcement agencies in the country had totally ceased doing gunpowder residue determinations for that second reason.
| ^ERRORS PATENT
A review of the record reveals one patent error, in the trial court’s sentencing of the defendant on his conviction for attempted second degree murder to serve twenty years at hard labor without benefit of probation or suspension of sentence. The sentence must be served without benefit of parole, as well as without benefit of probation or suspension of sentence. See La. R.S. 14:27(D)(l)(a)[5] and La. R.S. 14:30.1(B).[6]
La. R.S. 14:27(D)(l)(a) provides, in pertinent part, that if the offense attempted is punishable by life imprisonment, the offender shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation or suspension of sentence. The offense of second degree murder is punishable by mandatory life imprisonment at hard labor. La. R.S. 14:30.1(B). Therefore, the sentence for attempted second degree *960 murder must be served without benefit of probation, suspension of sentence or parole.
However, La. R.S. 15:301.1(A) provides that the failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of parole, probation or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without such benefit(s). La. R.S. 15:301.1(A) deems that those required statutory | ^restrictions are contained in the sentence, whether or not imposed by the sentencing court, and that statutory provision self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence resulting from the failure of the sentencing court to impose the restriction(s). State v. Williams, 2000-1725, p. 10 (La.11/28/01), 800 So.2d 790, 799; State v. Boudreaux, 2007-0089, pp. 3-1 (La.App. 4 Cir. 8/15/07), 966 So.2d 79, 81-82.
Accordingly, the defendant’s sentence is automatically required to be served without benefit of parole, probation or suspension of sentence, regardless of whether trial court included those limitations in the sentence.

ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, the defendant argues that the trial court erred in granting a mistrial based on juror misconduct, then reconsidering its ruling and going forward with the trial.
After selection and swearing of the jury, prior to the swearing of the first witness, a deputy sheriff overheard one of the jurors, Cressida Rhodes-Polk, referred to as Ms. Rhodes by the trial court, state: “I don’t care if they keep me here for three days, I’m going to vote guilty. I didn’t think I was going to be picked on the jury.” Rhodes also stated, apparently at the same time, something to the effect that she believed that if one leaves his home with a gun that one intends to cause bodily harm, a view she had openly expressed during voir dire. Rhodes replied in the affirmative when asked by defense counsel if other jurors had been present when she made those comments to the deputy, and whether they heard it.
12/The following colloquy occurred:
MR. CAPITELLI:
We move for a cause — challenge—
THE COURT:
You can go.
MR. CAPITELLI:
Your honor, additionally at this time we would move for a mistrial.
THE COURT:
Motion granted. Motion granted. I have to declare a mistrial.
MR. PHILLIPS:
Judge, before—
THE COURT:
I’m going to listen, Mr. Phillips, but I think the lady has tainted the entire jury, but go ahead. I’m going to listen.
MR. PHILLIPS:
Before the court declares a mistrial, Judge, we’re going to ask that we be, under 775.1, allowed to ask for a 24 hour—
THE COURT:
I thought you were going to ask me if you could do individual voir dire on her comment.
MR. PHILLIPS:
I mean, I would like that also.
THE COURT:
You’re entitled to that.
MR. PHILLIPS:
LfiYes, sir.
THE COURT:
*961 You’re entitled to that.
MR. PHILLIPS:
If the Court will so allow us—
THE COURT:
Absolutely. All right. We are going to have to bring them down one at a time.
[[Image here]]
Now, the only issue now is, is this entire panel tainted to the point where the Defense cannot get a fair trial.
Each individual juror was brought down and questioned by the State and defense counsel. Immediately thereafter, defense counsel stated: ‘Your Honor, we would like to — I want to renew this motion for a mistrial.” The trial court found no evidence “whatsoever” that the jury had been tainted by what Cressida Rhodes-Polk had said. The court found that Rhodes-Polk had simply wished to avoid serving on the jury, and it denied the motion for mistrial. At no point did defendant object that the trial court had already granted the motion for mistrial and was improperly “reconsidering” it. As far as all were concerned, the trial court had not granted the motion for mistrial, but instead, after questioning all the jurors, the trial court denied the motion for mistrial.
On appeal the defendant argues that the trial court erred in declaring a mistrial based upon prejudicial statements by a juror in the presence of other jurors, and then “implicitly” withdrawing its prior factual finding and declaration 127of a mistrial and ordering that the trial go forward. The defendant concedes that his research has not revealed a Louisiana case directly on point concerning the withdrawal or reconsideration by a trial court of the declaration of a mistrial in a criminal case.
The first issue is whether or not the trial court actually declared a mistrial. As quoted above, upon defense counsel moving for a mistrial, the trial court immediately stated: “Motion granted. Motion granted. I have to grant a mistrial.” However, the trial court made this purported ruling prior to it giving the State an opportunity to respond, effectively granting a motion for mistrial ex parte, which obviously is impermissible. The prosecutor, when given the opportunity to respond to the defendant’s motion for mistrial, initially stated: “Before the court declares a mistrial,....” This suggests that the State did not contemplate that the trial court had granted a motion for mistrial. However, in the same sentence the prosecutor went on to say: “Judge, we’re going to ask that we be, under 775.1, allowed to ask for a 24 hour — ,” before being interrupted by the trial court. This reference by the prosecutor to La.C.Cr.P. art. 775.1 suggests that the prosecutor was of the opinion that the trial court had granted the motion for mistrial, given that the article is directed to providing a remedy in the event the trial court grants a mistrial. La.C.Cr.P. art. 775.1 states:
If a judge orders a mistrial, then upon motion of either the state or the defendant, the court shall order an automatic twenty-four-hour stay of all proceedings in which either the state or the defendant may take an emergency -writ application to the appropriate reviewing court. The jury shall not be released pending the stay unless both the state and defendant agree to release the jury.
There is no Louisiana appellate decision citing La.C.Cr.P. art. 775.1, which took effect in 2004. Acts 2004, No. 413 § 1. The defendant cites State v. Joseph, 434 So.2d 1057 (La.1983), for the proposition that the Louisiana Supreme Court “has taken the view that an order for a mistrial is immediately self-operative and dismisses the jury.” In Joseph, the trial court declared a mistrial on its own motion after *962 the State rested, apparently because of the court’s concern over the State not having presented evidence to rebut the defendant’s testimony that he had not freely confessed to the crime. The defendant, being tried for attempted second degree murder, had not sought the mistrial and did not object or say anything more after the trial court declared the mistrial. Prior to the beginning of the defendant’s second trial, he filed a motion to quash based upon double jeopardy. The motion was denied, and the defendant was tried for the second time and found guilty as charged. On appeal, the defendant raised the denial of his motion to quash, which had been based on double jeopardy. The Louisiana Supreme Court agreed that the motion had merit, ruling in general that a plea of double jeopardy should be maintained when a defendant has been impermissibly deprived of his right to have his trial completed by the jury before which he had been placed in jeopardy, by the trial court’s own granting of a mistrial without the defendant’s express consent and without his interest having prompted the court’s ruling. The court found that Joseph was just such a case and so reversed the defendant’s conviction and sentence and dismissed the charge.
The instant case is not concerned with a double jeopardy issue, given that defendant moved for the mistrial and the ground was not due to any action by the State. However, in Joseph, prior to reaching its conclusion, the court had to address the State’s argument that the defendant’s failure to voice any objection to the trial court’s sua sponte order of mistrial precluded him from raising the issue on appeal. The court, citing and quoting State v. Simpson, 371 So.2d 783 (La.1979), stated that in Simpson it had noted that the failure of the defendant to object to a mistrial which he had not sought and from which he had not benefitted was inconsequential “since once a mistrial is declared the trial is over.” The defendant in the instant case cites Joseph for this proposition, that once the trial court in the instant case said, “Motion granted. Motion granted. I have to declare a mistrial,” the mistrial took effect; the trial had ended. The defendant also cites Joseph because the court also quoted Simpson as follows concerning the contemporaneous objection rule of La.C.Cr.P. art. 841[7]:
As a final point in Simpson this Court noted that the failure of the defendant to object to a mistrial which he had not sought and from which he was not benefited was inconsequential since once a mistrial is declared the trial is over. We stated clearly at 371 So.2d [at] 738:
it [sic] is apparent that contemporaneous objection and reservation of a bill are not applicable to a plea of double jeopardy. As originally drafted, Article 841 did not require a bill to be reserved for “a ground for arrest of judgment under Article 859 ...,” one of which is double jeopardy. Moreover, it is clear that requiring a contemporaneous objection to an improperly granted mistrial does not advance the purpose of the rule, which is to put the trial judge on notice of the alleged irregularity and to provide him with the opportunity to correct the problem during trial. State v. *963 Dupre, 339 So.2d 10 (La.1976); State v. Charles, 326 So.2d 335 (La.1976). When a mistrial is declared, the jury is dismissed. (Compare the effect of granting a motion for acquittal, even when erroneously granted. State v. Hurst, 367 So.2d 1180 (La.1979). Unless the defendant anticipates the declaration of a mistrial, the trial ends without the opportunity to object. See United States v. Jorn, [400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) ] supra.
In addition to the above, a function of the contemporaneous objection rule is to facilitate appellate review of adverse lower court rulings. SinceJjgappellate review does not in the normal course follow a trial aborted by the grant of a mistrial, this purpose is not served by the noting of an objection to the granting of a mistrial.
Joseph, 434 So.2d at 1060.
Insofar as the purpose of the contemporaneous objection rule, the circumstances of the instant case are completely unlike those in either Simpson or Joseph. In the instant case the motion for mistrial was made prior to the first witness being sworn, and defendant essentially acquiesced in the trial court’s action in commencing the three-day trial. It cannot be said that the purpose of the contemporaneous objection rule is not advanced by requiring, under the circumstances presented by the instant case, that the defendant object to the trial court action, giving the trial court the opportunity to consider the issue of whether it had already declared a mistrial. If the trial court had considered that issue and determined that it had already granted defendant’s motion for mistrial, then it could have granted the State the opportunity pursuant to La.C.Cr.P. art. 775.1 to take an emergency writ application to this court.
The trial court stated: “Motion granted. Motion granted. I have to grant a mistrial.” Supra. The next spoken words were by the prosecutor, “Judge, before — . Supra. The court interrupted to say that it believed Rhodes-Polk had tainted the entire jury, but directed the prosecutor to continue. The prosecutor then stated: “Before the court declares a mistrial, Judge, we’re going to ask that we be, under 775.1, allowed to ask for a 24 hour — .” Supra. While the prosecutor mentioned La. C.Cr.P. art. 775.1, which is applicable only after a mistrial is ordered, from that point on the trial court, defense counsel, and the State all treated the matter as a pending motion for mistrial.
| ■», Each juror was questioned apart from the other jurors by both the State and the defense as to the behavior of Rhodes-Polk. After all of the jurors had been questioned, defense counsel simply renewed the motion for a mistrial, arguing that the jury had been tainted. The trial court gave reasons why it found no evidence of a taint, stating that it believed the other jurors viewed Rhodes-Polk’s statement as “just exactly what it was, a lie to get off of jury service.” The trial court said it did not believe there was one single juror who would give either side an unfair trial because Rhodes-Polk “told a lie.” The trial court concluded by stating: “Therefore, your motion for a mistrial is overruled. I note your objection. Ms. Fatherry is installed as the twelfth juror.”
The defendant’s failure to object after the trial court proceeded precludes the defendant from complaining of any error by the trial court in continuing the trial. Moreover, defense counsel’s actions effectively operated as a judicial confession that the trial court had in fact not granted a mistrial. Finally, the actions of defense counsel, the trial court, and the prosecutor all belie the notion that a mistrial had been *964 granted at the point where defendant claims it was.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2

In his second assignment of error the defendant argues that the trial court erred in overruling the defendant’s objections and his motion for mistrial based on what the defendant argues were comments by the prosecutor during his closing argument that improperly appealed to racial prejudice.
The defendant’s argument is premised on the fact that Erik Beelman’s female companion at the time was a black female. While there was no testimony |32that his companion was black, she was pictured at least once on the video shown the jury from the Royal St. Charles Hotel’s video surveillance cameras. Thus, the jury knew Beelman’s companion was black.
The defendant first points to part of the prosecutor’s argument wherein he was referring to the testimony of Phillip Barba-rin, who was working on the night of the shooting for Downtown Parking as a supervisor for an overnight valet crew, one of his assigned locations being the Royal St. Charles Hotel. The prosecutor stated, in part:
MR. PHILLIPS:
[[Image here]]
He wanted to do the right thing, and that’s why he’s here to tell you the truth. To tell you what happened as he saw it and he didn’t tell you anything about Erik being belligerent [sic], being stumbling down drunk, did [sic] none of that. He told you Erik was friendly and the defendant was the one trying to pick a fight with him for whatever reason. Maybe it was the company he had. Maybe he didn’t like the company Erik had. Maybe that’s why he was so mad.
MR. CAPITELLI:
Objection, Your Honor.
THE COURT:
Overruled.
MR. PHILLIPS:
Maybe that’s why he was so mad, but is that illegal to walk with someone? Does that warrant to be shot in the head? Does it?....
The second comment objected to by defense counsel was:
MR. PHILLIPS:
You got a cell phone on you and this man is getting so loud and beligerant [sic] and you don’t — well, you said you couldn’t detain people allegedly. Well, why didn’t you put these on? Why didn’t you call and say, Look [sic], 911. I need help here. This guy doesn’t want to leave. I need some help |sshere. This guy doesn’t want to leave. I need some help. The first thing he pulls out is this, is this (indicating), and ladies and gentlemen, I know I’m not, my years aren’t that long, but I remember there was a day when the police told you to do something and you didn’t do it, then they just pull this thing out, because you didn’t listen, becuase [sic] you didn’t do what they told you to do. But this is 2009, ladies and gentlemen. So you’re going to tell me if the police tell you to walk up the street, a street that you have just as much a right to be on as anybody else, a street, he wasn’t in the hotel. A street. Get up the street, and [sic] you don’t get up the strteet [sic], then we get the batons out. What we going to get next, the fire hoses out?
MR. LONDON:
I object to that, Your Honor.
THE COURT:
Overruled.
*965 Later, after the conclusion of closing arguments, the trial court asked the parties whether either had any objection to the jury charge. Defense counsel replied in the negative, but noted that the defense had made objections during closing arguments that needed to be put on the record. After the trial court heard some more argument, it asked whether there was anything else, whereupon defense counsel stated, in pertinent part:
MR. LONDON:
Yes, there is, Your Honor. I object to the obvious racial overtones made during the closing arguments by Mr. Phillips when he discussed fire hoses that he may not be that old but he’s old enough to know how police run people off the street. I believe that that, and the record, read in the record would constitute racial overtones and I would ask for a mistrial based on that.
THE COURT:
Motion denied. Next. Anything else?
MR. LONDON:
I,¾Just for the record I would object to that continuing line of closing dealing with chasing people off the street and whatever is contained in that. Not just that one reference to the fire hose. That whole—
THE COURT:
Okay. Your objection is noted, overruled, motion for mistrial is denied. Sheriff, put us in recess.
La.C.Cr.P. art. 770 states, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
[[Image here]]
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
At no time did the defendant in the instant case request that only an admonition be given. The defendant asserts that the prosecutor apparently made the comments to inflame the passion of black jurors against defendant. However, the defendant does not identify the racial makeup of the jury. The record does not reflect the racial makeup of the jury, or the number of jurors who voted guilty— although the September 24, 2009 minute entry from the day the verdict was returned states that the defense moved the court to poll the jury.
Initially, it is to be noted that in objecting to the first comment cited by the defendant in this assignment of error, the reference to the defendant picking a fight with Erik Beelman because the defendant did not like the company Beelman was | 35with, defense counsel merely stated: “Objection, Your Honor.” Supra. The contemporaneous objection rule of La. C.Cr.P. art. 841(A)[8] not only provides that *966 “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence,” but also requires that the party state the grounds for the objection. See State v. Richards, 99-0067, p. 4 (La.9/17/99), 750 So.2d 940, 942 (“An objection stating no basis presents nothing for this court to review”), quoting State v. Dupar, 353 So.2d 272, 273 (La.1977); State ex rel. D.R., 2010-0405, p. 3 (La.App. 4 Cir. 10/13/10), 50 So.3d 927, 929 (“It is well settled that [a] defendant must state the basis for his objection when he makes it so that the trial judge has an opportunity to rule on it and prevent or cure an error.”, quoting Dupar, supra). Moreover, a defendant is limited on appeal to those grounds for the objections which he articulates at trial. State v. Brooks, 98-0693, p. 9 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 819; State v. Buffington, 97-2423, p. 9 (La.App. 4 Cir. 2/17/99), 731 So.2d 340, 346.
There are two purposes behind La. C.Cr.P. art. 841(A)’s contemporaneous objection rule: (1) to put the trial court on notice of the alleged irregularity or error, so that the court can cure the error; and (2) to prevent a party from gambling for a favorable outcome and then appealing on errors that could have been addressed by an objection if the outcome is not as hoped. State v. Landos, 2007^0082,36 p. 6 (La.4/8/08), 980 So.2d 643, 648, citing State v. Knott, 2005-2252 (La.5/5/06), 928 So.2d 534, and State v. Thomas, 427 So.2d 428 (La.1982).
Accordingly, given that the defendant failed to state any ground for the objection to the “company” comment, any complaint as to the trial court’s ruling as to that comment was not preserved for review.
Defense counsel also failed initially to state a ground for the objection to the prosecutor’s second comment to which defendant objected, concerning getting the fee hose out. However, shortly thereafter, following the conclusion of closing arguments and the trial court’s instructions to the jury, defense counsel stated the racial prejudice ground for the fire hose comment and moved for a mistrial. Thus, the defendant adequately preserved for review the trial court’s ruling as to that second complaint. When moving for a mistrial based on the fire hose comment, defense counsel did not refer at all to the prior comment concerning the “company” Beelman was with. Thus, the racial ground stated by defense counsel as to the fire hose comment does not cover the objection to the “company” comment.
It can also be noted that had defense counsel initially approached the bench and stated the racial basis of his first objection to the prosecutor’s comment concerning the “company” Beelman was with, the trial court could have admonished the prosecutor not to make any further comments that might be interpreted as appealing to race, and thus perhaps the prosecutor might not have made the subsequent fire hose comment. Instead, the defendant now seeks the reversal of his conviction and sentence based on both comments.
A trial court’s erroneous denial of a motion for mistrial based on one of the provisions of La.C.Cr.P. art. 770 is subject to the harmless error analysis. State v. Johnson, 94-1379, pp. 16-17 (La.11/27/95), 664 So.2d 94, 101-102; State v. Whins, 96-0699, p. 8 (La.App. 4 Cir. 4/9/97), 692 So.2d 1350, 1355.
*967 In State v. Kaufman, 278 So.2d 86, 98 (La.1972), the Louisiana Supreme Court commented on the prohibition against references by the district attorney to race:
The purpose of this mandatory prohibition of our 1966 code is to avoid the use of racial prejudice to obtain convictions. This is in accord with our jurisprudence since our earliest days as an American jurisdiction. It is, of course, founded upon a stringent requirement that trials be conducted in accordance with law and that convictions be founded on evidence of guilt and not upon prejudice. Without this mandatory rule of law, the convictions of innocent defendants may be secured, not because of their guilt, but because of their race.

Id.

In Kaufman, “two black defendants were on trial for the brutal murder of the two white victims before at [sic] white jury.” 278 So.2d at 96. The State presented as a witness Delores Williams, who had been riding with the two defendants on the night of the murder and had shared a motel room with them. Williams testified on direct examination as to the defendants’ actions that evening, without directly implicating them in the murder. On redirect examination the State asked this witness about a telephone conversation she had on the morning after the murder with Patricia Butler, asking Williams if she denied that she told Butler that “there were just two White honkys who got killed, and if it had been two colored people they would have forgotten about it.” The witness denied making the statement. The defendants moved for a mistrial. Later, Butler was called as a witness and asked about her conversation with Williams. Butler testified that Williams had said “something about honkys.” 278 So.2d at 97. The State immediately asked what she said about that, and the defendants moved for mistrial. IssThe objection was overruled, and Butler again said Williams had said something about “honkys.” The State asked her what Williams had said about “that.” Id. Over defense objections and motions for mistrial, all overruled, Butler eventually testified that Williams “just kept saying the white honkys. She said something about the honkys, these two men that was killed.” (Id.). The defendants again objected and moved for mistrial, which objection/motion were overruled.
Finally, in closing argument the prosecutor in Kaufman stated that Williams had denied telling Butler not to worry about those two “honkys.” Again, another objection/motion for mistrial were overruled. The two defendants were convicted of first degree murder and sentenced to death. On appeal, the Louisiana Supreme Court, on rehearing, found the issue of whether or not Williams had ever mentioned anything about “honkys” was “utterly irrelevant.” The court stated that the prosecutor had repeatedly emphasized the use of the derogatory epithet by an associate of the black defendants “with reference to the piteous innocent white victims of the crime, and this emphasis (without probative value as to the innocence or guilt of the defendants) could have only the effect of inflaming the white jury.” 278 So.2d at 98. The court held that the defendants’ motions for mistrial should have been granted, and it reversed the defendants’ convictions and death sentences.
In State v. Wilson, 404 So.2d 968 (La.1981), two black defendants were tried for the shooting death of a white male. The incident, which the court said had obvious racial overtones, occurred on a Sunday in a shopping center parking lot where a group of white males had gathered to drink beer and socialize. A confrontation occurred between the defendants and the *968 group of white males, in the course of which the defendants pulled out guns and fired several shots, one of them 1.^striking one of the white males. During closing arguments in the trial, the prosecutor first stated: “Why is it a black Sunday? Because these two animals decided to shoot white honkies.” 404 So.2d at 969. The defense objected and moved for a mistrial. The trial court denied the motion and instructed the jury to disregard the statement. The prosecutor then made a number of similar statements: “They were going to shoot white honkies.... They were going to go shoot white hon-key.... They left Oakwood Shopping Center, armed themselves and came back to shoot whitey, to kill whitey, and that’s exactly what they did.... These gentlemen had the opportunity to leave at any time, at any time. Nobody forced them into that shopping center with guns to kill whitey.” Id. Defense counsel did not object to these comments or then move for mistrial. The prosecutor subsequently made further racial remarks in rebuttal, to which defense counsel objected and moved for a mistrial. The trial court denied the motion for mistrial, but instructed the jury to disregard the comments.
The defendants in Wilson were convicted. On appeal, the Louisiana Supreme Court found that the comments were obviously intended to appeal to racial prejudice, as they had no relevance to the elements of the crime with which defendants were charged, murder, and did not tend to enlighten the jury as to a relevant fact. The court stated:
When the alleged criminal conduct arises out of an incident among persons filled with racial animosity our system of criminal justice requires that those charged with the responsibility for the conduct of criminal trials strictly avoid any actions which might influence the jury to decide the guilt or innocence of the accused upon prejudice rather than on the law and the evidence.
[[Image here]]
The jury is a time-honored and respected institution, indispensable to our system of criminal justice, and its members are expected to arrive at a|4nverdict in a calm and detached fashion, without having latent racial prejudices, which are sometimes strong, aroused by brutal incitements to convict and thereby obtain revenge inherent in racial remarks such as those made by the assistant district attorney in this case.
Wilson, 404 So.2d at 971.
The court in Wilson held that the trial court should have granted the defendants’ motions for mistrial, and it reversed the defendants’ convictions and sentences.
In the instant case, the defendant submits that the prosecutor’s fire hose comment constituted an indirect racial reference. The prosecutor stated that he remembered a day when the police told one to do something and if one did not they pulled “this thing” out, apparently referring/gesturing to the ASP baton in evidence, followed by the comment, “[w]hat we going [sic] to get next, the fire hoses out.” Supra. This reference could not have been anything other than a reference to the use of fire hoses by authorities to control and/or disperse primarily black Americans peacefully protesting the continued systemic deprivation of their civil rights in the segregated South. That image of protestors being pummeled and knocked down by water coming from high-pressure fire hoses is integral to any complete historical film footage record of the civil rights movement.
One could possibly see the fire hose reference as a general nonracial comment intended to get across to the jury the *969 objectionable nature of the security guard defendant’s actions in ordering Beelman and his companion, then on a public street, to move on, to “get on up the street.” Notably, the comment did not refer to Erik Beelmaris companion. However, because the fire hose comment unquestionably derives from the use of fire hoses by civil authorities to control or disperse demonstrators in the segregated South, it necessarily raised the specter of 141race. Nevertheless, that comment, viewed alone, does not appear to be the type of comment that might create prejudice against the defendant in the mind of the jury such that a reasonable juror would tend to convict the defendant even if said juror found the evidence insufficient. The comment was so far from the inciting and inflammatory statements of the prosecutors in Kaufman, supra, and particularly Wilson, supra, so as to be almost incomparable.
In addition, as previously noted, while the defendant asserts that the prosecutor apparently made the fire hose comment to inflame the passion of black jurors against defendant, he never states precisely how he might have been prejudiced in the mind of the jury by the comment. The defendant does not discuss the racial makeup of the jury, and the record does not reflect it. The Defendant could have been convicted of attempted second degree murder by ten jurors concurring in the guilty verdict. See La.C.Cr.P. art. 782 (“Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.”); La. R.S. 14:27(D)(l)(a) and La. R.S. 14:30.1(B) (conviction for attempted second-degree murder carries sentence of imprisonment at hard labor). The defendant fails to show that any black juror served on his jury, much less that any black juror voted to convict him.
Considering all the record evidence; the defects in the defendant’s argument insofar as him failing to state with specificity how he was or might have been prejudiced by the fire hose comment; his failure to address the issue of the racial makeup of the jury or how many jurors voted to convict; and the indirect nature and quality of the comment; even assuming the comment was of such a nature that it might have created prejudice against defendant in the mind of the jury, and thus Lpthat the trial court should have granted the motion for mistrial under La.C.Cr.P. art. 770, any such error would have been harmless because, based on the record, the verdict was surely unattributable to any such error. See State v. Higginbotham, 2011-0564, p. 3 (La.5/16/11), 60 So.3d 621, 623 (harmless error exists where the guilty verdict actually rendered was surely unattributable to the error.).
For the foregoing reasons, there is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3

In his third assignment of error the defendant argues that the trial court erred in excluding the testimony of Greg Meyer, defendant’s use of force expert, after a September 22, 2009 Daubert[9] hearing at which the defense sought to have Meyer qualified as an expert in the field of the use of force in lethal and nonlethal violent encounters.
A trial court acts as a gatekeeper to the admissibility of expert testimony under Daubert, which decision the Louisiana Supreme Court adopted in State v. Foret, 628 So.2d 1116, 1121 (La.1993). The court set forth the applicable law concerning the trial court’s gatekeeping function in the qualification of expert witnesses *970 under Daubert in State v. Young, 2009-1177, pp. 7-9 (La.4/5/10), 35 So.3d 1042, 1046-47, cert. denied, Young v. Louisiana, - U.S. -, 131 S.Ct. 597, 178 L.Ed.2d 434 (2010), as follows:
A determination regarding the competency of a witness is a question of fact. Cheairs v. State ex rel. Dept. of Transp. & Dev., 03-0680, p. 5 (La.12/3/03), 861 So.2d 536, 541. It is well settled that a trial judge is vested with wide discretion in determining questions of fact. Therefore, rulings on the qualifications of an expert witness will not be disturbed on appeal absent manifest error. Id.
^¡¡Louisiana Code of Evidence article 702 dictates the admissibility of expert testimony. It provides, “[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.” State v. Higgins, 03-1980, p. 33 (La.4/1/05), 898 So.2d 1219, 1239. Notably, this Court has placed limitations on this co-dal provision in that, “[ejxpert testimony, while not limited to matters of science, art or skill, cannot invade the field of common knowledge, experience and education of men.” [State v.] Stucke, 419 So.2d [939] at 945 [ (La.1982) ].
In Foret, this Court adopted the guidelines set forth by the United States Supreme Court in DaubeH for determining the reliability of expert scientific testimony under Louisiana Code of Evidence article 702. Foret, 628 So.2d at 1121. Daubert set a new standard to assist trial courts in evaluating the admissibility of expert testimony. It requires district courts to perform a “ga-tekeeping” function to “ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.” Id., 509 U.S. at 589, 113 S.Ct. at 2795.
In addressing the issue of reliability, Daubert articulated the following nonexclusive factors to be considered by district courts in determining the admissibility of expert testimony:
(1) The “testability” of the scientific theory or technique;
(2) Whether the theory or technique has been subjected to peer review and publication;
(3) The known or potential rate of error; and
(4) Whether the methodology is generally accepted in the scientific community.
Cheairs, 03-0680 at 7, 861 So.2d at 541.
The United States Supreme Court later held in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999), that the Daubert analysis is to be applied to determine the admissibility of all expert testimony, not just scientific testimony. Cheairs, 03-0680 at 7, 861 So.2d at 541.
Generally, the test of competency of an expert is the expert’s knowledge of the subject about which he is called upon to express an opinion. State v. Ferguson, 2009-1422, p. 25 (La.App. 4 Cir. 12/15/10), 54 So.3d 152, 166, writ denied, 2011-0135 (La.6/3/11), 63 So.3d 1008. A combination of specialized training, [44work experience and practical application of the expert’s knowledge can combine to establish that person as an expert. Id. Courts can also consider whether a witness has previously been qualified as an expert. State v. Craig, 95-2499, p. 9 (La.5/20/97), 699 So.2d 865, 870. Importantly, the refusal of a trial court to receive expert testimony “will rarely, if ever, provide grounds for reversal.” Craig, supra; *971 State v. Baker, 97-2856, p. 8 (La.App. 4 Cir. 3/3/99), 729 So.2d 167, 171. In the instant case, the defendant’s proposed expert, Greg Meyer, said he was an expert in the field of the use of force in lethal and non-lethal violent encounters. Meyer testified that he had an Associate of Arts degree, a Bachelor’s degree, and a Master of Science degree in Public Administration. He was a retired police officer, retiring as the captain of the Los Angeles Police Academy. He said that among his duties he was in charge of firearms and tactics training at the LAPD Academy.
When he was captain at the LAPD Academy in 2005, the Chief of the LAPD assigned him to lead the overhauling of the LAPD use of force policy. He retired while the process was ongoing, but continued to serve on that committee. He had conducted or supervised approximately two hundred homicide investigations and had been involved in investigations of officer-involved shootings as an investigator or reviewer for a higher authority for twenty years. He was on the National advisory Board of Force Science Research Center, within which was the Force Science Institute. The latter institute certifies experts on force science matters having to do with the biomechanics of officer-involved shootings and other major incidences, as well as the psychology involved in those incidents. He was a certified expert, having attended a five-day school and passed all the tests. Meyer testified that he had testified as an expert in federal courts on several occasions and |4Sin state courts in California, Arizona, Nevada, Florida, and Ohio. He had never been denied qualification as an expert witness.
However, Meyer admitted on cross examination that he had only testified in eight criminal cases, none of which involved a shooting. The prosecutor went through each of the eight criminal cases in which Meyer had testified, one-by-one.
Meyer detailed what he would review in a security officer case such as the instant one, saying he would look at the tactics used, the equipment and training provided to the security officer, the police report, videos, witness statements, medical records, and photographs. When asked whether he and other experts in the field would be able to replicate one another’s results by drawing on the above data, Meyer said one arguably could if looking at the same data and using the same source material, but that the opinions of different experts might vary. When asked whether there was a known or potential rate of error to the inquiry, Meyer replied that the error was in judgment calls an expert might make because he misinterpreted data and source material. He later explained during cross examination that it was not the type of field that would have a fixed error rate.
Defense counsel asked Meyer whether there had been or could be scientific inquiries to test the biomechanical factors involved, and he replied that that was the whole purpose of the Force Science Research Center — to conduct research and testing of the biomechanical and psychological factors that are evident in violent encounters. In response to a question by the court, Meyer estimated that the Force Science Research Center, headquartered at the University of Minnesota at Manka-to, had been in operation at least twelve to fifteen years.
On cross examination, Meyer said that the Force Science Institute was the training division of the Force Science Research Center, and the former had been in Inexistence for two to two and half years. Later, under questioning by the trial court, which stated that it was then on the Force Science Research Center’s website, Meyer *972 conceded that the center might have been formed longer ago than the two and one half years he had estimated. Meyer explained that the Force Science Research Center conducts scientific experiments around the country, typically using police departments for different research scenarios having to do with various aspects of the use of force, such as reaction time, biome-chanic issues, stress issues, and the psychological issues in violent encounters. The Force Science Institute, he said, trains people on the subject of the biomechanics and the psychology of violent encounters. Meyer estimated that he had sixty to seventy-five, maybe as many as eighty, hours of study in bio-mechanics and psychology. He said he had also attended courses through the International Association of Chiefs of Police, American Society for Law Enforcement Training, and the Peace Officers Association of Los Angeles.
Commenting on his experience as a police officer, Meyer said he was the investigator’s supervisor at the lieutenant and captain level over approximately two hundred homicides over a period of years. However, he conceded that for the most part in the homicide investigations his investigation was directed toward developing or capturing a suspect. He said that in officer-involved use-of-force incidents, the police department had a lot of internal processes he was involved in to determine the propriety of those incidents. Meyer replied in the affirmative when asked whether he had written anything in the field that had been published, stating that his curriculum vitae contained an extensive listing of his articles over several pages. Meyer admitted that he had never written anything for the Force |47Science Center, but said it interviews him now and then and quotes him in its articles. Meyer said he wrote for PoliceOne.com and several other organizations.
Under questioning by the court, Meyer said he did not know if there were any experts qualified in Louisiana in lethal and non-lethal violent encounters, specifically including the biomechanics and the psychological issues of shootings. He said that several dozen people had been certified by the Force Science Institute over the last few years, but he did not know if any resided in Louisiana. Meyer was uncertain whether there was an annual gathering of experts in the field to have an exchange of ideas and training.
Meyer confirmed under questioning by the court that most of his published articles, which the trial court referred to as numerous, came from PoliceOne.com. He said that for a couple of years he had written a monthly article for it. He had also written several for Police Magazine, and he noted that he also was on that magazine’s advisory board. The trial court asked whether the bulk of Meyer’s publications had to do with alternatives to lethal force. Meyer replied in affirmative, stating that was one of his primary fields of expertise for thirty years, since he did the LAPD’s original research on lethal weapons in 1979 and 1980. The trial court asked Meyer when was the first time an expert was qualified by a district court in the United States in this field of expertise. Meyer said it as about twenty years ago, since a 1989 U.S. Supreme Court decision, Graham v. Connor, (no citation given), established the standards nationally by which police use of force is to be judged, which gave rise to a whole need for expert analysis to determine what was objectionably reasonable.
The trial court questioned whether any part of the field of expertise had been subjected to scientific scrutiny. Meyer said there were certainly a lot of ^psychologists involved in the experiments, and that the training derived from *973 the results. Asked what the methodology of the experiments was, Meyer said that if the question had to do with reaction time in a stress scenario, for example, they would set up experimental groups and control groups to see how they perform. He said they would film it down to the thousandth of a second with super high speed cameras and then evaluate the data. He said “a lot of the articles about these experiments are peer reviewed before they’re published.” The trial court asked whether there was any publication outside the Force Science Research Center that had assessed the scientific validity of the tests. Meyer replied that as far as he knew there were none, stating that he thought the Force Science Research Center was pretty unique in studying these particular issues.
On redirect examination Meyer replied in the affirmative when asked whether he been qualified as an expert in civil cases, be it in lethal and non-lethal force, use of force or police procedure, in which there was a shooting. He named three, all involving fatal shootings. He said that typically a shooting is the high end of a use of force continuum, and he confirmed that all of his force cases involved applications of force that fell somewhere along that continuum. He estimated that approximately one in six of his cases involved the use of a firearm, and that the others involved other types of force. Meyer confirmed that police in Los Angeles carry ASPs. When the trial court noted that it looked like police used pepper spray, Tasers and dogs before going to the ASP and the pistol, Meyer replied: “I think it’s safe to say that for the past 18 years there’s been very little baton use in law enforcement around the country, not just in Los Angeles.” He said striking somebody with an ASP or a regular type police baton is frowned on greatly by the public. He said the whole idea in using ASPs, regular batons, 14!)pepper spray, and Tasers was to prevent the situation from degenerating into a shooting confrontation. He said most of the time it works, but sometimes it does not.
Meyer replied in the affirmative when asked whether he had done similar review of the application of force along that force continuum when he did internal investigations and reviews of officer involved shootings for a period of some twenty years. He confirmed that the process generally mirrored what he did as a private consultant on cases, stating that the analytical approach was identical.
Prior to the start of the third day of trial on September 28, 2009, the trial court ruled that Meyer would not be permitted to testify as an expert in the use of force in lethal and non-lethal violent encounters. The court stated that it was readily apparent that the proposed field of the “science” of human behavior had not been tested, and that the court had not been presented any information about it, other than from Meyer himself. The court found that there was no way to test Meyer’s reasoning or methodology to determine whether it was scientifically valid, and that the field of endeavor was not that type of inherently reliable field of which the court could take judicial notice.
The court stated that it had carefully considered the seven suggested factors in Daubert and found that Greg Meyer’s testimony would not assist the jury as a finder of fact to understand or determine the facts in issue and determine the ultimate issue in the case — what the court said was whether defendant acted in self-defense. The court found that Meyer’s testimony would be offered to the jury to bolster defendant’s credibility and/or bolster the defense theory. Noting that the admissibility of expert testimony is considered under the general evidentiary proba *974 tive value/prejudicial balancing test under La. C.E. art. 403, the court |50believed there was a substantial danger of unfair prejudice against the State, implicitly finding that this danger of substantial prejudice outweighed the probative value of the evidence.
After Greg Meyer’s testimony concluded at.the Daubert hearing, defense counsel submitted a number of cases to the trial court. The Defendant argues that the expert field of “use of force” and “police procedure” is well -established in Louisiana and has been recognized by both Louisiana courts and federal courts sitting in Louisiana.
The defendant cites Evangelist v. Department of Police, 2008-1375 (La.App. 4 Cir. 9/16/09), 32 So.3d 815, an appeal by a former police officer from a decision by the New Orleans Civil Service Commission affirming his termination, wherein Dr. Wade Schindler testified “as an expert in the proper use of force by a police officer.” 2008-1375, p. 14, 32 So.3d at 824. No issue as to the qualification of Dr. Schindler as an expert was mentioned. The Commission had upheld the New Orleans Police Department’s termination of the police officer plaintiff for, inter alia, simple battery and unauthorized use of force, all charges deriving from the plaintiffs striking of an individual three times in his chest, apparently with a baton, after the individual had allegedly been subdued by plaintiff and other law enforcement officers and was lying on the ground with three other officers holding him down. Dr. Schindler expressed his opinion that Mr. Evangelist acted appropriately in conformity with his training and NOPD rules on use of force. In addition, the Commission had accepted the expert testimony of Major Kerry Najolia, via the admission of a transcript of his testimony from Evangelist’s criminal trial, presumably for a grade of battery. Maj. Najolia was the Director of Training at the Jefferson Parish Sheriffs Office Training Academy and | ita certified POST instructor “and expert in ‘force continuum’ (the protocol or escalation of methods and devices to subdue opponents with appropriate force — from a wave-over to a taser).... ” Id. This Court reversed the Commission’s decision, stating in pertinent part:
All the witnesses who testified regarding police training on the use-of-force continuum — Major Najolia, Dr. Schindler, Sgt. Harris, and Mr. Evangelist, agreed that blows to the torso are among accepted maneuvers to obtain compliance, and are not unauthorized force. For instance, a blow to the shoulder area, the brachial-plexus tie-in muscle zone is to effect the hand’s release of a grip or a weapon. No witness testified that blows to the torso area were not appropriate, and witnesses who did testify on that issue agreed that individual circumstances vary, and the criterion is necessary force to obtain compliance. Thus the charges of the Appointing Authority are inherently erroneous and cannot support the termination of Mr. Evangelist.
Evangelist, 2008-1375, p. 21, 32 So.3d at 828-29.
The defendant also cites Estate of Francis v. City of Rayne, 2007-359 (La.App. 3 Cir. 10/3/07), 966 So.2d 1105, involving a wrongful death suit filed against the City of Rayne, Louisiana, and two of its police officers after the plaintiffs’ decedent was shot to death following a low-speed pursuit by police. The trial court accepted the testimony of Lloyd Grafton, “qualified as an expert in the field of use of force and police policy and procedure.” 2007-359, p. 8, 966 So.2d at 1111. The officers fired approximately twenty rounds at the decedent, who was seated in his car shifting *975 between drive and reverse, and revving his car engine, after decedent refused their commands to exit the car. Dr. Grafton referenced photographs showing the final location of the car and explained that its position and lack of tires (the tires had been blown out and the car was on wheel rims), indicated that the car would not have had traction if the decedent had attempted to escape. He opined that, given these circumstances, “at the point [the officers] used deadly force, in my judgment, had they slowed down, they could have used other l^options without taking the man’s life.” Id. There was no discussion as to the witness’s qualifications as an expert.
The defendant also cites several federal court decisions, none of which was reported in the pertinent respective reporters. The first case was Harris v. City of Shreveport, 69 Fed.Appx. 657 (5 Cir.2003), involving the shooting death of the plaintiffs son by a Shreveport, Louisiana police officer. The plaintiff asserted claims under 42 U.S.C. §§ 1981 and 1985 and also pled several Louisiana state law claims, including assault, battery, false imprisonment, negligence, wrongful death, loss of enjoyment of life, and violations of the decedent’s constitutional rights. The jury concluded that the plaintiff had failed to prove excessive force by a preponderance of the evidence, and the trial court entered a take-nothing judgment and dismissed the plaintiffs remaining claims with prejudice. On appeal, as to the trial court’s denial of the plaintiffs motion for judgment as matter of law or, alternatively, a new trial, the appellate court noted that a use of force expert testified that the police officer who shot and killed the decedent acted appropriately in using deadly force.
The next ease cited by the defendant is Thomas v. City of Monroe, 157 F.3d 901 (5 Cir.1998), (unpub.), involving excessive force claims by police officers. However, the only use of force expert at issue in Thomas was a deputy sheriff with over twenty years of experience tendered by the plaintiff as an expert in the area of police conduct relative to entry of a residence, use of force, excessive force and standards of care for custody of intoxicated people. The trial court refused to qualify the deputy sheriff as an expert, and on plaintiffs appeal the appellate court found no abuse of discretion in that ruling.
1 mThe defendant next cites two unreported decisions involving suits against the City of Bunkie, Louisiana, where the same Dr. Grafton who testified for the plaintiff in Estate of Francis v. City of Rayne, supra, testified for the respective plaintiffs.
In Clayton v. City of Bunkie, 2009 WL 840225 (W.D.La.2009), the plaintiff was sprayed by a police officer, Officer Sanders, with a chemical agent “Freeze Plus P,” handcuffed, and arrested. The district court decision recited that Dr. Lloyd Grafton, an associate professor of criminal justice at an unnamed Louisiana university, was accepted as an expert in the use of force and general police procedures. Dr. Grafton testified as to the continuum of force, which explains the general levels of control an officer should exert in response to degrees of resistance asserted by a subject. Dr. Grafton referred to the “Defensive Tactics Student Manual” issued by PPCT Management Systems, Inc., and specifically explained the “Resistance Control Continuum” found in the “PPCT” (see Doucet, infra) Manual. Based on his review of the records, Dr. Grafton opined that Officer Sanders should have effected the arrest of the plaintiff by using a soft empty hand control technique, such as a wrist lock, rather than deploying his chemical weapon. The district court returned a decision in favor of the plaintiff.
*976 In Doucet v. City of Bunkie, 2008 WL 649123 (W.D.La.2008), aff'd. 316 Fed.Appx. 321 (5 Cir.2009), an “Officer Sanders” sprayed the plaintiff with a chemical agent “Freeze Plus P”, handcuffed and arrested him. The court accepted Dr. Grafton as an expert in the use of force. Dr. Grafton took the court through portions of the “PPCT” (Pressure Point Control Tactics) Defensive Tactics Student Manual, including the “Resistance Control Continuum,” which, the decision noted, explains the general levels of control an officer should exert in response to degrees |B4of resistance asserted by a subject. As in Clayton, Dr. Grafton opined that the officer involved should have acted other than he did. The district court returned a decision in favor of the plaintiff.
It can be noted that Dr. Wade Schindler, who testified as an expert in Evangelist, supra, has a Ph.D., and is or was a professor of Criminology at Tulane University. He also is or was president of Orleans Regional Security Institute, a consulting firm. See Wilson v. Town of Mamou, 2007-409, p. 9 (La.App. 3 Cir. 12/19/07), 972 So.2d 461, 468 (Dr. Schindler qualified as an expert in police procedure) and Reinhardt v. City of New Orleans (NOPD), 2009-1116, p. 3 (La.App. 4 Cir. 1/13/10), 30 So.3d 229, 233 (Dr. Schindler qualified as an expert in police officer qualifications). As noted in Clayton, supra, Dr. Lloyd Grafton is an associate professor of criminal justice at an unnamed Louisiana university. Greg Meyer touted no similar academic qualification, although he had associate and bachelor’s degrees, as well as a Master of Science degree in Public Administration.
None of the cases cited by the defendant and discussed above was a criminal case. The instant case is a criminal matter. Nor did any of those cases cited by the defendant involve the use of force by a security guard. The instant case does. Greg Meyer did not refer to any authority such as the “Defensive Tactics Student Manual” issued by PPCT Management Systems, Inc., and the “Resistance Control Continuum” found in the “PPCT,” as relied on by Dr. Grafton in Clayton and Doucet.
The trial court granted defense counsel’s request to proffer what the opinion testimony of Meyer would have been. Meyer testified on proffer that in his opinion there should have been gunshot residue tests performed on the defendant and the victim, and he also stated that an effort should have been made to retrieve 15r,video evidence from any cameras that might have been at the Marriott Hotel across St. Charles Avenue from where the incident occurred. Meyer said he also would have testified that if a person hit a security guard in the head and continued to attack him, the security guard would have been justified in using an ASP baton on the attacker, and that if there was a struggle over a firearm, there could have been an accidental shooting or even a legitimate intentional shooting if the security guard struggling to retain his firearm reasonably believed that he was subject to a deadly force attack or serious bodily injury attack.
This proffer shows the very limited nature of Greg Meyer’s proposed testimony. The senior forensic pathologist with the Orleans Coroner’s Office, Dr. Alvaro Hunt, stated that gunshot residue tests cost over $2,000.00 to perform; that they are unreliable; and that a lot of law enforcement agencies in the country had totally ceased doing gunpowder residue determinations because of their unreliability. There was no evidence there had been any video surveillance cameras at the Marriott Hotel across St. Charles Avenue from where the incident occurred. The trial court instructed the jury on the homicide self-defense theory, La. R.S. 14:20(A), at the *977 defendant’s request, as well as La. R.S 14:19(C) (person not engaged in unlawful activity and in a place where he has a right to be has no duty to retreat before using deadly force or violence), and La. R.S. 14:21 (aggressor cannot claim self-defense).
The jury verdict shows that it obviously found the defendant’s testimony not credible insofar as the gun having accidentally discharged or insofar as that defendant was in imminent danger of losing his life or receiving great bodily harm and that he needed to shoot Erik Beelman to save himself from that danger. The issue of self-defense depended on the credibility of the witnesses, and the jury |Sfiobviously found the testimony of Philip Barbarin and Erik Beelman credible and the testimony of the defendant not credible.
Considering all of the evidence, it cannot be said that the trial court clearly abused its discretion in not accepting the testimony of Greg Meyer. Moreover, to the extent that it could possibly be said that the trial court clearly abused its discretion in its ruling, considering Meyer’s proffered testimony, any such error would be harmless — the verdict was surely unattributable to any such error. Higginbotham, supra.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 4

In his fourth assignment of error, the defendant argues that the trial court erred in precluding the defense from asking whether Erik Beelman had “reached an agreement with [his female companion] for an illegal exchange of money and sex.” It was the defendant’s position that Beel-man’s female companion was a prostitute date. The trial transcript reflects the following colloquy:
BY MR. HYATT:
Q Immediately prior to you walking in the door of the hotel had you reached an agreement with her—
MR. PHILLIPS:
Objection. It calls for hearsay, Your Honor, and he’s trying to testify in front of the Jury.
THE COURT:
Sustained.
Immediately prior to that colloquy defense counsel had asked Beelman what happened in the hotel room after he and his female companion went upstairs. The | S7prosecutor objected on the ground of relevance, and the trial court sustained the objection.
The defendant cites, in the Supplemental record, pages six through eight of the nine-page transcript entitled: “IN-CHAMBER ARGUMENT held on the 22nd day of September, 2009,.... ” In the transcript defense counsel, Mr. Capitelli, moved the court to reconsider “the sus-tainment of objection on the grounds that the question I’m asking seeks relevant questions surrounding what we referenced at the bench.” It can be noted that another defense counsel, Mr. Hyatt, examined Erik Beelman, and it is unclear from the September 22, 2009 trial transcript exactly at what point during Beelman’s testimony the parties went into chambers to discuss this prostitute issue.
The trial court replied to Mr. Capitelli that, having considered La. C.E. art. 801(D)(4), the objection was overruled in part, as to what he, Beelman, said, and sustained in part, as to whatever someone else said. However, the court then cautioned defense counsel, noting that in the first trial there was an effort by the defense to prove Beelman was with a prostitute at the time of the incident, and that the court assumed that was going to be part of the defense strategy in the second *978 trial. The trial court stated that it had not allowed it at the first trial, and it was not going to allow it at the second trial. Unidentified defense counsel argued that the evidence was permissible under La. C.E. art. 404(B). Defense counsel reasoned that defendant was a security guard charged with securing the hotel from illegal conduct, and thus there was justification for his interaction with Beelman. The trial court countered that the shots were fired on a city street, and that the defense had failed to present a compelling argument that the fact that Beelman’s female | ¡^companion was a prostitute fell under La. C.E. art. 404(B). The trial court stated that such evidence was nothing more than showing Beelman had a bad character.
On appeal, the defendant cites La. C.E. art. 801(D)(4), and argues that evidence Beelman’s female companion was a prostitute was part of the res gestae. La. C.E. art. 801(D)(4) provides that a statement is not hearsay if:
The statements are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events, and which are necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.
However, La. C.E. art. 801(D)(4) is not the res gestae article. It refers to statements. The defendant fails to specify what statements he was trying to get into evidence. It could be that he is referring to any statement by either Beelman or his female companion to each other that would constitute evidence of a prostitution arrangement. However, the defendant’s argument is couched in terms of res gestae, or the integral act exception to the general rule that evidence of other crimes, wrongs, or acts by a person is generally inadmissible.
La. C.E. art. 404(B)(1) is the res gestae article, and provides in pertinent part that:
(1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. (Emphasis added).
| MThe Louisiana Supreme Court explained the res gestae and integral act evidence in State v. Colomb, 98-2813, pp. 3-4 (La.10/1/99), 747 So.2d 1074, 1075-1076, vis-á-vis the State seeking to introduce evidence, as follows:
This Court has long approved of the introduction of other crimes evidence, both under the provisions of former R.S. 15:448 relating to res gestae evidence and as a matter of integral act evidence under La. C.E. art. 404(B), “when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it.” State v. Brewington, 601 So.2d 656, 657 (La.1992). This doctrine encompasses “not only spontaneous utterances and declarations made before and after commission of the crime but also testimony *979 of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances.” State v. Molinario, 383 So.2d 345, 350 (La.1980). We have required a close connexity between the charged and uncharged conduct to insure that “the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.” State v. Haarala, 398 So.2d 1093, 1098 (La.1981) (emphasis added); see also 1 McCormick on Evidence, § 190, p. 799 (4th ed., John William Strong, ed., 1992) (other crimes evidence may be admissible “[t]o complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings.”) (footnote omitted). The res geaste [sic] or integral act doctrine thus “reflects the fact that making a case with testimony and tangible things not only satisfies the formal definition of an offense, but tells a colorful story with descriptive richness.” Old Chief v. United States, 519 U.S. 172, 186, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997). The test of integral act evidence is therefore not simply whether the state might somehow structure its case to avoid any mention of the uncharged act or conduct but whether doing so would deprive its case of narrative momentum and cohesiveness, “with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.” Id.
The defendant argues that, just as the State can introduce evidence of other crimes, wrongs or acts as integral act evidence/res gestae, to complete the story of the crime on trial by placing it in the context of nearby and nearly | (^contemporaneous happenings, he too should have been permitted to present evidence that Beelman, the victim, was with a prostitute.
Lest there be some doubt or uncertainty, given that the situation rarely arises, a defendant has a right to present evidence of other crimes, wrongs or acts by a victim as part of the res gestae. La. C.E. art. 404(B)(1) begins by stating that “[e]xeept as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible_” La. C.E. art. 412 refers to evidence of a victim’s past sexual behavior in sexual assault cases. Thus, under La. C.E. art. 404(B)(1) evidence as to other crimes, wrongs, or acts by a victim is admissible under the limited exceptions provided by the article unless such evidence is evidence of a victim’s past sexual behavior in sexual assault cases.
As set forth hereinabove,- the res gestae “encompasses ‘not only spontaneous utterances and declarations made before and after commission of the crime but also testimony of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances.’ ” Colomb, 98-2813, p. 3, 747 So.2d at 1075-1076, quoting State v. Molinario, 383 So.2d 345, 350 (La.1980).
Defense counsel’s question to Beelman was: “Immediately prior to you walking in the door of the hotel had you reached an agreement with her — ,” and then the State objected. It appears that the question, assuming defense counsel had completed it by asking Beelman if he had reached an agreement with her to exchange sex for money, or something similar, would have been proper, as it would have called for *980 evidence of a statement made immediately before the two entered the hotel and moments prior to what Beelman testified was snickering and laughing by the defendant, the hotel desk clerk and others, possibly directed at |fi1 Beelman and his companion. Based on Beelman’s testimony, and to a lesser degree that of the defendant also, this snickering and laughing was the inception of the chain of events leading to the shooting.
The trial court sustained the State’s objection based on what it later stated was its belief that the question was intended to show nothing more than that Beelman had a bad character, or that he was bad man. The evidence was not admissible for the purpose of showing that Beelman was a bad man. Colomb, 98-2813, p. 3, 747 So.2d at 1076 (“We have required a close connexity between the charged and uncharged conduct to insure that ‘the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.’ ”, quoting State v. Haarala, 398 So.2d 1093, 1098 (La.1981)).
However, the defendant submits that much was made throughout Beelman’s testimony on direct examination and the State’s cross examination of defendant concerning defendant’s attitude or interest in Beelman. The defendant submits that much of any interest in Beelman could be explained as the defendant, a security guard at his post, taking an interest in a person apparently engaged in illegal conduct. This argument is a legitimate one and does not suggest a desire by the defendant to introduce the evidence to paint Erik Beelman as a bad man. While the trial court correctly noted that the shooting, virtually the entire confrontation, occurred outside the hotel on a city street, the genesis of the incident, according to the Beelman, occurred inside. Beelman testified that when he entered, after the defendant, a person behind the front desk and others in regular clothes greeted him | fi?and he greeted them, he heard snickering and laughing coming from them. Beelman testified that he did not know if it had been directed towards him.
Beelman testified that he met his female companion that morning in the French Quarter, where he had been drinking at one or more bars. The possibility that the two met in a French Quarter bar, left the bar, walked across Canal Street, one block up to the hotel, but that any arrangement to exchange sex for money occurred “immediately prior to them walking in the door of the hotel,” is extremely remote. The defendant fails to show that, had a prostitution arrangement been confected at any time before the point in time that was immediately before the two walked into the door of the hotel, evidence of the arrangement could be said to have been encompassed by the res gestae doctrine. Obviously, that is why defense counsel phrased the question to Beelman as whether “immediately prior to you walking in the door of the hotel had you reached an agreement with her — .” He wanted to get the evidence in as part of the res gestae.
A trial court’s ruling on the admissibility of evidence under La. C.E. art. 404(B)(1) will not be disturbed absent an abuse of discretion. State v. Lawrence, 2009-1637, p. 8 (La.App. 4 Cir. 8/25/10), 47 So.3d 1003, 1008; State v. Gibson, 99-2827, p. 12 (La.App. 4 Cir. 4/11/01), 785 So.2d 213, 220.
Considering how remote the possibility was that Erik Beelman and his companion confected an agreement to exchange sex for money “immediately prior to” them entering the hotel, and not before then, it cannot said that the trial court would have *981 erred in implicitly considering that factor and thus concluding that defense counsel’s primary purpose in asking the full question, which counsel was unable to do before the State objected, was to get before the jury the notion that Beelman was with a prostitute — that Beelman was a bad man, which is | ^impermissible. Thus, it cannot be said that the trial court abused its discretion in sustaining the State’s objection to the question.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 5

In this last assignment of error, the defendant argues that during rebuttal argument the State inappropriately vouched for the veracity and accuracy of the statements of an unknown cab driver on the recording of the 911 call.
The defendant prefaces his argument by stating that the 911 recording, which was properly admitted in evidence, “included a call from a cab driver to the 911 call center relating what he claimed he saw.” Thus, the defendant admits that the call at issue was from a cab driver.
In rebuttal the prosecutor stated:
MR. PHILLIPS:
* * *
See, at the end of the day all of this was convenient for them. It’s convenient to say off the screen, all of this, they make up all this stuff that happened, reach for this, reach for that, but how do you explain Barbarin? How do you explain this man on the tape? He’s a cab driver. Use your common sense here. We’re from New Orleans. Where do cab driver’s [sic] go?
MR. LONDON:
I object to that, Your Honor.
THE COURT:
Overruled.
MR. PHILLIPS:
"Where are the cab stands? By hotels. Especially downtown. You see cabs lining up for blocks. Sometimes you can’t even park on the street ^because cab drivers — and when did this happen? Seven o’clock on a week day morning, in the CBD. You’re going to have cab drivers all over there. You saw the video. They had seven, eight cabs driving down the street, and this is a cab driver who is right there.
MR. CAPITELLI:
Objection.
THE COURT:
Overruled.
MR. CAPITELLI:
I didn’t hear anything about—
THE COURT:
Overruled.
MR. PHILLIPS:
And you know—
THE COURT:
Hold on a second. Hold on. Listen, I’ve ruled on this. Don’t make anymore [sic] statements like that to the jury, Mr. Capitelli. I have ruled on this. We’ve had a conference on the sidebar about it. You are overruled. Do not make anymore [sic] arguments to the jury.
Proceed.
Reading the colloquy in a light most favorable to the defendant, and particularly noting defense counsel’s comment that he did not “hear anything about — ” (before being interrupted by the court), it is fair to say that the objection was as to the prosecutor representing something to the jury that was not reflected in the 911 tape or as to which other evidence had not been introduced. Thus, defendant preserved the issue for review.
| fi¡;The defendant argues that the State went beyond the evidence as to what the *982 cab driver could see, where the cab driver was located, and used that argument beyond the evidence to vouch for and support the prosecution theory of the case.
However, the closing argument transcript- shows that immediately prior to making the comments about the cab driver/cab drivers in general to which defendant objected, the prosecutor played for the jury the 911 call from the cab driver. Thus, the jury was well aware of what precisely the cab driver said or did not say. Immediately prior to the cab driver’s 911 call being played for the jury, defense counsel objected and the bench conference referred to by the trial court above was held.
The defendant argues that the prosecutor’s actions in talking about the prevalence of cabs and their parking habits, no evidence of which was presented during the trial, suggested to the jury that the cab driver who called had a vantage point from which he could see the events in issue.
The general rules on closing/rebuttal argument are that the scope of closing argument shall be confined to the evidence admitted, the lack of evidence, conclusions of fact that the state or defendant may draw therefrom, and the law applicable to the case; the argument shall not appeal to prejudice. La.C.Cr.P. art. 774. The state’s rebuttal shall be confined to answering the argument of the defendant. Id. However, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036; State v. Jackson, 2008-0286, pp. 10-11 (La.App. 4 Cir. 4/29/09), 11 So.3d 524, 533. Further, a trial court has broad discretion in controlling the scope of closing arguments. Casey, supra; State v. Jones, 2010-0018, p. 9 (La.App. 4 Cir. 11/10/10), 51 So.3d 827, 833, writ denied, 2010-2683 (La.4/25/11), 62 So.3d 85. _[^Even in the case of a prosecutor exceeding the bounds of proper argument, a reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict. State v. Wiltz, 2008-1441, p. 6 (La.App. 4 Cir. 12/16/09), 28 So.3d 554, 558, writ denied, 2010-0103 (La.11/12/10), 49 So.3d 885; State v. Haney, 2008-0217, p. 4 (La.App. 4 Cir. 5/13/09), 12 So.3d 496, 499. Even where the prosecutor’s statements are improper, a reviewing court should accord credit to the good sense and fair-mindedness of the jurors who heard the evidence. Harvey, supra.
In the instant case, the prosecutor apparently exceeded the scope of proper rebuttal in referring to facts not in evidence with regard to cab drivers being parked in front of hotels. However, the reference to the cab driver being “right there,” was proper. It could be inferred from the 911 call by someone apparently identifying him(her)self as a cab driver that such cab driver was in a position to see what he reported to the 911 operator, and thus had been “right there” to view what he later reported.
Crediting the good sense and fair-mindedness of the jurors who heard the evidence, it cannot be said that the trial court erred in overruling the defendant’s objection. Further, considering the record evidence, any error by the prosecutor in making the comment about cab drivers parking in front of hotels was harmless. The guilty verdict rendered in the instant case was surely unattributable to such comment. State v. Higginbotham, 2011-0564, p. 3 (La.5/16/11), 60 So.3d 621, 623 (harmless error exists where the guilty verdict actually rendered was surely unattributable to the error.).
*983 There is no merit to this assignment of error.
| (i7In his prayer for relief the defendant argues that the assigned errors, both individually “and collectively,” justify a reversal of his conviction. However, none of the alleged errors raised by the defendant individually constitutes reversible error. The cumulative effect of alleged errors complained of by a defendant on appeal, none of which constitutes reversible error individually, does not deprive the defendant of his right to a fair trial, and thus does not constitute reversible error. See State v. Draughn, 2005-1825, p. 70 (La.1/17/07), 950 So.2d 583, 629, citing State v. Copeland, 530 So.2d 526, 544-545 (La.1988). Further, the cumulative effect of harmless errors does not warrant reversal of a conviction or a sentence. State v. Strickland, 94-0025, pp. 51-52 (La.11/1/96), 683 So.2d 218, 239; State v. Tart, 93-0772, p. 55 (La.2/9/96), 672 So.2d 116, 154.

DECREE

For the foregoing reasons, we affirm the defendant’s conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED
MURRAY, J., concurs in the result.

. The bill of information charging defendant spells his last name as "Marlone.” However, the correct spelling is "Marlowe."

. The State spelled Beelman’s first name as "Eric” in the bill of information, but subsequently amended it to spell the first name as "Erik.”

. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694(1966).

. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. La. R.S. 14:27(D)(l)(a) states:
D. Whoever attempts to commit any crime shall be punished as follows:
(l)(a) If the offense so attempted is punishable by death or life imprisonment, he shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence.

. La. R.S. 14:30.1(B) states:
B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of-sentence.

. La.C.Cr.P. art. 841 states, in pertinent part:
A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

. La.C.Cr.P. art. 841(A) states:
A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court *966 the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

. See citation at footnote 3.