| STATE OF LOUISIANA | * | NO. 2023-KA-0524 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| GARRETT J. WARD | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 541-639, SECTION "F"
Honorable Robin D. Pittman, Judge
\* \* \* \* \* \*
**Judge Nakisha Ervin-Knott**
\* \* \* \* \* \*
(Court composed of Judge Daniel L. Dysart, Judge Nakisha Ervin-Knott, Judge
Monique G. Morial)

Jason Rogers Williams
District Attorney
Brad Scott
Chief of Appeals
Zachary M. Phillips
Assistant District Attorney
ORLEANS PARISH
619 South White Street
New Orleans, Louisiana 70119

      COUNSEL FOR THE STATE OF LOUISIANA/APPELLEE

Jane Hogan
ATTORNEY AT LAW
310 N. Cherry Street, Suite 1
Hammond, LA 70403

      COUNSEL FOR DEFENDANT/APPELLANT

**REVERSED, VACATED, AND REMANDED**
**APRIL 17, 2025**

The defendant, Garrett Ward ("Defendant"), seeks review of his conviction and sentence for manslaughter. For the reasons that follow, we reverse the judgment of the trial court, vacate Defendant's manslaughter conviction and sentence, and remand this matter to the trial court for a new trial.

## STATEMENT OF THE FACTS

On the evening of January 5, 2018, Defendant attended a dinner party with his girlfriend, Katy Kelly ("Ms. Kelly"), and her work colleagues at Chophouse in New Orleans, Louisiana. After dinner, Defendant, Ms. Kelly, Ms. Kelly's co-workers – Jonathan Guy ("Mr. Guy") and Jamie Yorsch ("Ms. Yorsch") – and Ms. Yorsch's husband relocated to the Hot Tin bar atop the Pontchartrain Hotel on St. Charles Avenue in New Orleans, Louisiana.

In the early morning hours, around 1:00 A.M. the next day, a verbal altercation between Defendant and Ms. Kelly ensued at the bar wherein Defendant slapped Ms. Kelly in the face. Defendant left the bar and had an encounter with Arnold Jackson ("Mr. Jackson") outside of the Pontchartrain Hotel, which resulted in Defendant attacking Mr. Jackson. According to several eyewitnesses to the attack, Defendant

1

used his hands and feet to repeatedly strike Mr. Jackson in the head. After the attack, Defendant fled to a nearby parking garage.

Kerrie Williamson ("Ms. Williamson"), an eye-witness to the attack, called 911, and upon arriving on the scene, New Orleans Police Department ("NOPD") officers found Mr. Jackson lying on the ground, conscious, with severe blunt force trauma to the head and face. The NOPD officers located Defendant at the nearby parking garage, where he appeared intoxicated, and arrested him for simple battery.

When the paramedics arrived on the scene, they transported Mr. Jackson to University Medical Center ("UMC"). At UMC, Mr. Jackson's condition declined, and he required emergency brain surgery. Ultimately, Mr. Jackson succumbed to his injuries on January 18, 2018.

## PROCEDURAL HISTORY

On June 7, 2018, Defendant was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. On June 11, 2018, Defendant pled not guilty to the charge.

A six-day jury trial commenced with jury selection on May 2, 2022, and concluded on May 10, 2022, with the jury returning a responsive verdict of guilty of manslaughter. Prior to sentencing, on June 27, 2022, Defendant filed a motion for post-verdict judgment of acquittal, which was denied. On the same day, the trial court sentenced Defendant to thirty years imprisonment at hard labor with credit for time served. After sentencing, on July 22, 2022, Defendant filed a motion to reconsider sentence that was denied by the trial court following a hearing on December 15, 2022. This appeal followed.

2

**ERRORS PATENT**

In accordance with La. C.Cr.P. art. 920(2), all appeals are reviewed for errors patent on the face of the record. A review of the record reveals one error patent.

The record evidences that the trial court sentenced Defendant less than twenty-four hours after denying his motion for post-verdict judgment of acquittal. Thus, the trial court erred in failing to observe the twenty-four hour delay required by La. C.Cr.P. art. 873. Louisiana Code of Criminal Procedure Article 873 states that if "a motion for new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled," unless the defendant "expressly waives" the delay or pleads guilty. Nevertheless, if a defendant waives the twenty-four hour sentencing delay, then the trial court's failure to wait at least twenty-four hours after a motion for new trial constitutes harmless error. *State v. Robinson*, 2021-0254, p. 21 (La. App. 4 Cir. 2/18/22), 336 So.3d 567, 580.

Defendant was convicted by jury on May 10, 2022. Defendant filed a motion for post-verdict judgment of acquittal, which the trial court denied at a hearing on June 27, 2022. Following the denial of the motion for post-verdict judgment of acquittal, the trial court asked defense counsel whether Defendant was invoking his right to a sentencing delay, to which defense counsel responded that Defendant was waiving the delay. The trial court proceeded to sentence Defendant. When the trial court sentenced Defendant on the same day as the denial of the motion for post-verdict judgment of acquittal, the trial court failed to comply with the twenty-four hour sentencing delay found in La. C.Cr.P. art. 873. However, Defendant waived the twenty-four hour sentencing delay when he expressly waived the delay in open court following the denial of his motion for post-verdict judgment of acquittal.

3

Accordingly, although the trial court erred in failing to observe the twenty-four hour delay required by La. C.Cr.P. art. 873, we conclude the error was harmless.

## DISCUSSION

On appeal, Defendant assigns five errors for this Court's review: (1) there is insufficient evidence to support Garrett Ward's manslaughter conviction; (2) the trial court erred by refusing to grant a mistrial and the repeated injection of racially charged testimony deprived Garrett Ward of his right to due process; (3) the trial court erroneously permitted the introduction of other crimes evidence; (4) the trial court erroneously permitted Detective Haw to testify about blood splatter without being qualified as an expert; and (5) the trial court erred when it imposed an unconstitutionally excessive sentence of thirty years on a first offender.

### Assignment of Error Number One: There is insufficient evidence to support Garrett Ward's manslaughter conviction.

In his assignment of error one, Defendant contends there is insufficient evidence to support his manslaughter conviction. We first determine whether sufficient evidence exists to support the conviction of manslaughter. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992) ("When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal....").

Pursuant to *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), this Court must determine that the evidence, viewed in the light most favorable to the prosecution, "was sufficient to convince a rational trier of fact that all the elements of the crime had been proved beyond a reasonable doubt." *State v. Neal*, 2000-0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657 (citations omitted). The

statutory test of La. R.S. 15:438[1] "works with the *Jackson* constitutional sufficiency test to evaluate whether all the evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." *Id.*

This Court has previously set forth the applicable standard of review for sufficiency of the evidence:

> In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Green*, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. *State v. Mussall*, 523 So.2d 1305 (La. 1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. *Mussall*; *Green*; *supra*. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." *State v. Smith*, 600 So.2d 1319 [at 1324] (La. 1992) at 1324.

*State v. Huckabay*, 2000-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111.

The State charged Defendant with the second degree murder of Mr. Jackson, a violation of La. R.S. 14:30.1, and the jury found him guilty of manslaughter, a violation of La. R.S. 14:31, and a statutory responsive verdict to second degree murder pursuant to La. C.Cr.P. art. 814(A)(3). Louisiana Revised Statute 14:31(A)(1) defines manslaughter as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by

---

[1] Louisiana Revised Statutes 15:438 provides, "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."

5

provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.[2]

"[A]n appellate court will not reverse a jury's return of a responsive verdict, whether or not supported by the evidence, as long as the evidence is sufficient to support a conviction for the charged offense." *State v. Harris,* 2002-1589, p. 4 (La. 5/20/03), 846 So.2d 709, 712-13. Defendant argues that there is insufficient evidence for his conviction of manslaughter because the State failed to prove that the attack was not the result of self-defense. Defendant argues that he acted in self-defense when he attacked Mr. Jackson, thus, his actions were legally justified.

A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1). "In a homicide case in which the defendant asserts he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense." *State v. Kirk,* 2011-1218, pp. 6-7 (La. App. 4 Cir. 8/8/12), 98 So.3d 934, 939-40 (citing *State v. Taylor*, 2003-1834, p. 7 (La. 5/25/04), 875 So.2d 58, 63).

Turning to the facts of this case, Defendant asserts the State failed to prove that he did not act in self-defense because there was clear evidence that Mr. Jackson attempted to rob him with a knife. Defendant also asserts the amount of force he used was reasonable because he was unarmed and suffered stab wounds.

---

[2] Under La. R.S. 14:31, there are several definitions of manslaughter. However, La. R.S. 14:31(A)(1) was the only definition the trial court read to the jury.

Defendant testified at trial concerning the events that preceded the attack. Defendant testified that he, along with Ms. Kelly and her co-workers, caught an Uber to Hot Tin bar after dinner with her work colleagues. While in the Uber, Ms. Kelly sat in the front seat – on Mr. Guy's lap – and Defendant stated he thought Mr. Guy's actions were inappropriate. Once at the bar, Defendant noticed Mr. Guy's continued inappropriate behavior towards Ms. Kelly – putting his hand on her lower back while looking at the rooftop view and privately talking to her in the corner – and confronted her about it. This verbal altercation resulted in Defendant slapping Ms. Kelly in the face. Defendant stated that he was not proud of what he did.

Following the incident between Defendant and Ms. Kelly, Defendant testified that he proceeded downstairs to call a ride home and had Ms. Kelly's phone in his possession because his phone was dead. He was sitting on a tree planter outside the Pontchartrain Hotel when Ms. Kelly's mother called, and he gave Ms. Kelly her phone. Defendant further testified that he fell asleep outside and woke up to a man – Mr. Jackson – attempting to rob him.

The only testimony supporting Defendant's claim that he was being robbed and stabbed when he began attacking Mr. Jackson was Defendant's self-serving testimony. Specifically, Defendant testified that the victim was "going through my pockets" and "I noticed my hand had a sharp – something sharp over me…." There were three eye-witnesses at the scene of the attack who testified at trial – (1) Kerrie Williamson ("Ms. Williamson"); (2) Detrick Rainge ("Mr. Rainge"); and (3) Deondria Rainge ("Mrs. Rainge"). The fact that none of these eye-witnesses to the attack corroborated Defendant's testimony regarding Mr. Jackson allegedly trying to rob him is quite telling.

At trial, Ms. Williamson testified that she was right in front of "Red Zone" – a convenience store located next to the Pontchartrain Hotel – at the time of the attack and saw Defendant walk out of the Pontchartrain Hotel; she also saw Mr. Jackson in the area. Ms. Williamson testified that at no point did she see Mr. Jackson with a knife nor did she see Mr. Jackson attempt to rob Defendant. Rather, Ms. Williamson attested to the fact that she saw Mr. Jackson walk towards Defendant – maybe to ask him for some money – and when Mr. Jackson put his hand out, Defendant punched him in the face. Ms. Williamson witnessed Mr. Jackson falling to the ground, due the Defendant's punches, where Defendant began kicking him. Although she could not recall how many times Defendant hit Mr. Jackson, she recalled Mr. Jackson not retaliating with any violence.

Mr. Rainge, a valet at the Pontchartrain Hotel at the time of the attack, also testified at trial. He testified that his then-girlfriend now wife, Mrs. Rainge, visited him at work on the morning of the attack. According to Mr. Rainge, they were sitting in her vehicle, which was parked in front the hotel, when she noticed the attack. Mr. Rainge exited the vehicle and noticed Defendant punching Mr. Jackson. As he approached the two men, he also noticed Defendant kicking Mr. Jackson. Eventually, Mr. Rainge pulled Defendant off of Mr. Jackson. Mr. Rainge testified that he did not notice Mr. Jackson with a knife or any type of sharp object, nor did he see a knife or sharp object on the ground where the attack took place.

Additionally, Mrs. Rainge testified at trial about what she observed on the morning of the attack. She testified that she witnessed Defendant punching Mr. Jackson in the face, which prompted her to alert her then-boyfriend, Mr. Rainge, of the attack. After Mr. Rainge exited her vehicle, but before he reached the two men, Mrs. Rainge observed Defendant kicking Mr. Jackson in the face. Once Mr. Rainge

8

separated the two men, Defendant walked down the street and turned into a parking garage. On the morning of the attack, Mrs. Rainge gave a recorded statement on one of the police officer's body-worn cameras, in which she stated that Mr. Jackson was "minding his own business" when the Defendant, who she described as an "angry drunk," "got up and just started beating him up."

Further undermining Defendant's self-defense claim was his own trial testimony that he did not tell anyone at the scene that he was fearful due to Mr. Jackson's alleged robbery. Defendant admitted that he did not tell his grandmother, whom he called while detained in lockup, that he was robbed even though she asked him if he was hurt and Defendant responded in the negative. Additionally, Ms. Kelly was not aware that Defendant had allegedly been robbed. Defendant also testified that on the morning of the attack he declined offers of medical assistance at the scene. Defendant further admitted that at no time following this incident did he seek any medical attention in connection with his alleged knife wound. At the time of trial, there were no scars present on Defendant's palms. Moreover, an enlarged photograph of Defendant with his hands up – taken at the time he was apprehended by police shortly after the attack occurred – showed the blood on his palms was dry, and there was no blood dripping from Defendant's palms as one would expect shortly following a stabbing.

Even assuming Mr. Jackson was the aggressor, Defendant's claim that the amount of force he used was reasonable is not supported by the evidence. All three eye-witnesses recounted Defendant repeatedly punching and kicking Mr. Jackson, to the point that he landed on the ground, while Mr. Jackson never retaliated with physical force. At trial, when asked whether he saw a knife in Mr. Jackson's hands, Defendant initially responded that he did not see a knife in his hands. When he was

asked the same question again, Defendant conceded "I don't know." The amount of force Defendant used on Mr. Jackson was especially unreasonable considering the fact that no one saw Mr. Jackson physically threaten Defendant nor did anyone, including the Defendant, see him with a knife in his hands.

Admittedly, Mr. Jackson had pre-existing medical conditions – hepatitis, diabetes, and cirrhosis – that negatively impacted his ability to recover from his injuries sustained as a result of the attack. Dr. Gabriel Tender ("Dr. Tender"), a neurosurgeon and Mr. Jackson's treating physician at UMC, testified at trial and was qualified as an expert in the treatment of Mr. Jackson in his neurosurgeon capacity. He attested to these medical conditions, along with the fact that Mr. Jackson had cocaine and opiates in his system when he was admitted to the hospital. Dr. Tender testified that Mr. Jackson had a subdural hematoma, which required surgery, and while the hematoma was able to be removed, he suffered a stroke. Dr. Tender opined that if Mr. Jackson had not experienced the trauma to his brain and the swelling hematoma, he would not have required surgery; and, if he had not received these injuries, Mr. Jackson would not have required intubation and suffered a stroke, which lead to his death.

Dr. Kelly Scrantz ("Dr. Scrantz"), a neurosurgeon employed at the Neuro-Medical Center in Baton Rouge, Louisiana, also testified at trial and was qualified as an expert in neurosurgery. Dr. Scrantz acknowledged that Mr. Jackson's pre-existing medical conditions would increase his chances of having "a more negative outcome." However, Dr. Scantz opined that the blows to Mr. Jackson's head "set off the process," which led to his death.

After a review of the evidence before this Court, we find that the jury made reasonable credibility determinations in favor of the State and rationally rejected

Defendant's assertion of self-defense. The record reveals sufficient evidence to conclude that any rational trier of fact could have found that the State proved beyond a reasonable doubt all the elements of manslaughter. Accordingly, we conclude that this assignment of error, regarding the manslaughter conviction, is without merit.

***Assignment of Error Number Two: The trial court erred by refusing to grant a mistrial and the repeated injection of racially charged testimony deprived Garrett Ward of his right to due process.***

Having determined that the evidence is sufficient to support Defendant's manslaughter conviction, we now turn to Defendant's remaining assignments of error. In his assignment of error two, Defendant maintains the trial court erred by refusing to grant a mistrial as the repeated injection of racially charged testimony deprived him of his right to due process. Defendant's argument is based on Ms. Williamson's trial testimony, in which the State questioned her about Defendant's comments towards Mr. Jackson during the attack.

During direct examination, the following exchange occurred:

**MR. WILLIAMS:**

Let me ask you this. You told us what Mr. Jackson was saying. What was Mr. Ward [Defendant] saying?

**MS. WILLIAMSON:**

"Nigger".

**MR. WILLIAMS:**

Just --

**MS. WILLIAMSON:**

And he told me something.

**MR. WILLIAMS:**

Just the word?

11

**MS. WILLIAMSON:**

"You fucking nigger; get a job; you fucking bum." And then not just that. For some reason, him being drunk, I guess he thought for some reason, I was being friendly to him; because then he started putting me and him in the same boat.

**MR. WILLIAMS:**

What do you mean?

**MS. WILLIAMSON:**

Like saying, "You know how they are; they're not like us."

Later on in her direct examination, the exchange continued:

**MR. WILLIAMS:**

And what were the words that he [Defendant] used during the attack of Mr. Jackson?

**MS. WILLIAMSON:**

That's what was so strange. He shouldn't have gone toward him. I tried to push him off. I wasn't strong enough to hurt him, but I tried, and Mr. Jackson wasn't doing anything, nothing.

**MR. WILLIAMS:**

And what were his words, though?

**MS. WILLIAMSON:**

"You fucking nigger; you fucking bum." And then he hit him, and at first he tried to stopped [sic] himself from falling and he grabbed Mr. Arnold's arm, and he flung him off.

**MR. WILLIAMS:**
And that was before he started kicking?

**MS. WILLIAMSON:**

Yeah. That's before.

**MR. WILLIAMS:**

And what did Mr. Ward [Defendant] say to you as he was leaving? You said he tried to…?

**MS. WILLIAMSON:**

He tried – he said something about, "I know how they are; you know how they are; they're not like us."

At the conclusion of Ms. Williamson's testimony, outside the presence of the jury, defense counsel made an oral motion for mistrial on grounds that the State failed to provide notice of its intent to introduce Ms. Williamson's racially-charged testimony that she heard Defendant call Mr. Jackson the "n-word." The State responded by asserting it had no prior knowledge of Ms. Williamson's testimony and stated, "We made the Defense aware of everything we knew when we knew it." Relying on the State's representation, the trial court denied the motion for mistrial.

Louisiana Code of Criminal Procedure Article 775 provides, in pertinent part, "…a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771." According to La. C.Cr.P. art. 770, the trial court must grant a mistrial, once requested by a defendant, "when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to: (1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury; …An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial." "Clearly, under Louisiana law, a mistrial is mandatory when a prosecutor refers directly or indirectly to race or color and the remark or comment is not material and not relevant and might create prejudice against the defendant in the mind of the jury." *State v. Thompson*, 2015-0886, p. 48

(La. 9/18/17), 233 So.3d 529, 559 (citing *State v. Wilson*, 404 So.2d 968, 970 (La. 1981)).

In the matter herein, the State contends La. C.Cr.P. art. 770 is not applicable to this case because the racially-charged comment was made by Ms. Williamson, who is not a court official, judge, or district attorney, and the prosecutor had no prior knowledge of her comment. Contrary to the State's argument, a reading of the passage shows that while the prosecutor may not have initially been aware of Ms. Williamson's racially-charged comment when he first inquired about Defendant's statements during the attack, based on Ms. Williamson's answer to his initial question, the prosecutor was aware of her racially-charged testimony – yet solicited this testimony – when he repeated the same question. "Because the [racially-charged testimony] was solicited by the prosecutor, the statement can be imputed to the district attorney, and the trial court should have granted the mistrial under article 770." *State v. Genter*, 2003-1987, p. 27 (La. App. 4 Cir. 4/7/04), 872 So.2d 552, 567. Consequently, under the specific facts of this case, we find the trial court erroneously denied Defendant's motion for mistrial pursuant to the mandatory mistrial provision of La. C.Cr.P. art. 770(1).

This Court has applied the harmless error analysis in several cases where the trial court erred in denying a motion for mistrial based on La. C.Cr.P. art. 770. In *State v. Juarbe*, this Court applied the harmless error analysis when the trial court erred in denying a motion for mistrial under La. C.Cr.P. art. 770(2). 2001-2250, p. 8 (La. App. 4 Cir. 7/31/02), 824 So.2d 1240, 1247. Similarly, in *State v. Genter*, this Court applied the harmless error analysis when the trial court erroneously denied a motion for mistrial pursuant to La. C.Cr.P. art. 770(2). *Genter*, 2003-1987, pp. 26-27, 872 So.2d at 566-67.

14

Several years later, in *State v. Marlowe*, this Court applied the harmless error analysis to the trial court's denial of a motion for mistrial under La. C.Cr.P. art. 770(1). 2010-1116, pp. 36-37 (La. App. 4 Cir. 12/22/11), 81 So.3d 944, 966 (citations omitted) ("A trial court's erroneous denial of a motion for mistrial based on one of the provisions of La. C.Cr.P. art. 770 is subject to the harmless error analysis."). In *Marlowe*, the defendant – a black male – was charged with attempted second-degree murder of a white male. *Id.* at p. 1, 81 So.3d at 948. The defendant was working security at a New Orleans hotel, and the victim and his companion were guests at the hotel. *Id.* at p. 4, 81 So.3d at 949-50. An argument between the defendant and victim ensued, escalated – with the defendant pulling out his ASP baton and the parties struggling for control of the baton, and ultimately ended with defendant shooting the victim in his face. *Id.* at pp. 8-10, 81 So.3d at 952-53. During closing arguments, the prosecution made a comment that referenced getting "the fire hoses out." *Id.* at p. 33, 81 So.3d at 964. The defendant asserted this comment constituted an indirect racial reference and moved for a mistrial, which the trial court denied. *Id.* at p. 33, 81 So.3d at 965. On appeal, defendant asserted the trial erred in denying his motion for mistrial. *Id.* at p. 31, 81 So.3d at 964. This Court, in describing the prosecutor's comment, recognized:

> The prosecutor stated that he remembered a day when the police told one to do something and if one did not they pulled "this thing" out, apparently referring/gesturing to the ASP baton in evidence, followed by the comment, "[w]hat we going [sic] to get next, the fire hoses out." *Supra.* This reference could not have been anything other than a reference to the use of fire hoses by authorities to control and/or disperse primarily black Americans peacefully protesting the continued systemic deprivation of their civil rights in the segregated South. That image of protestors being pummeled and knocked down by water coming from high-pressure fire hoses is integral to any complete historical film footage record of the civil rights movement.

15

*Id.* at p. 40, 81 So.3d at 968. This Court admitted the fire hose comment "raised the specter of race", however, went on to find:

> [E]ven assuming the comment was of such a nature that it might have created prejudice against defendant in the mind of the jury, and thus that the trial court should have granted the motion for mistrial under La.C.Cr.P. art. 770, any such error would have been harmless because, based on the record, the verdict was surely unattributable to any such error. See *State v. Higginbotham*, 2011-0564, p. 3 (La. 5/16/11), 60 So.3d 621, 623 (harmless error exists where the guilty verdict actually rendered was surely unattributable to the error.).

*Id.* at pp. 41-42, 81 So.3d at 969.

Despite our court's application of the harmless error analysis, more recent jurisprudence from our superior court instructs us that the harmless error analysis should not be applied in this present matter. In *State v. Thompson*, the Louisiana Supreme Court found the appellate court erred in applying the harmless error analysis to evaluate the effect of the trial court's erroneous ruling in denying defendant's motion for mistrial pursuant to La. C.Cr.P. art. 770(1). 2015-0886, p. 55, 233 So.3d at 563. There is "the unbroken line of jurisprudence holding that an improper appeal to racial prejudice in violation of La. C.Cr.P. art. 770(1) is *per se* prejudicial and a mistrial is mandatory." *Id.* at p. 52, 233 So.3d at 561. "When an improper appeal to racial prejudice infects a proceeding, …a substantial right of the defendant is violated, prejudice is presumed, and reversal is required." *Id.* at p. 55, 233 So.3d at 563.

In *Thompson*, the defendant was the mayor of Jonesboro, Louisiana, and during his second term in office was charged with three counts of malfeasance in office. *Id.* at p. 2, 233 So.3d at 532. The case ultimately proceeded to a jury trial. In his opening statement and during examination of one of the state's witnesses, the prosecutor made statements directly referring to race in connection with the case. *Id.*

at p. 49, 233 So.3d at 559. Specifically, during the examination of one of the state's witnesses, the prosecutor stated, "Mr. Purpera, there's been allegation made…[that] the Mayor has been harried by various conservative and or white people…." *Id.* at p. 45, 233 So.3d at 557. The defendant moved for a mistrial, but the trial court denied the motion. *Id.* at p. 47, 233 So.3d at 558. On appeal, the appellate court determined that considering the injection of race into the proceedings, the trial court erred in not granting the mistrial though such error was subject to the harmless error analysis. *Id.* at p. 50, 233 So.3d at 560. The Louisiana Supreme Court agreed with the appellate court that the trial court erred in not granting defendant's motion for mistrial, yet determined that such error was a structural error, not subject to a harmless error analysis. *Id.* at p. 55, 233 So.3d at 565.

Louisiana Code of Criminal Procedure Article 921 provides, "A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused." In determining whether the substantial rights of the accused have been violated, the Louisiana Supreme Court has adopted the harmless error test announced in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and refined by *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). *Id.* at p. 52, 233 So.3d at 561. Under the harmless error test, "the inquiry 'is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.'" *Id.* at p. 52-53, 233 So.3d at 561. However, there are exceptions to the harmless error test that are known as structural errors. *Id.* at p. 53, 233 So.3d at 56. "'The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the

17

framework of any criminal trial.'" *Id.* A structural error "'affect[s] the framework with which the trial proceeds,' rather than being 'simply an error in the trial process itself,'" and therefore "infects the entire proceeding, thereby 'def[ying] analysis by harmless error standards.'" *Id.* at p. 53, 233 So.3d at 561-62.

> The Louisiana Supreme Court observed:

> While the [United States] Supreme Court has not expressly ruled that an appeal to racial prejudice during the presentation of evidence or argument to the jury constitutes structural error, in our view, such an appeal carries the indicia of structural error in that racial bias implicates the defendant's right to trial before an impartial jury. Like racial discrimination in the selection of grand jurors (a structural error pursuant to *Vasquez v. Hillery*, 474 U.S. 254, 263-64, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)), the injection of racial considerations during the presentation of evidence harms not only the defendant, but "undermine[s] public confidence in the fairness of our system of justice." *Alex v. Rayne Concrete Service*, [20]05-1457, [20]05-2344, [20]05-2520, pp. 23-24 (La. 1/26/07), 951 So.2d 138, 155-56 (citing *Batson v. Kentucky*, 476 U.S. 79, 87, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 629, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991)). Such considerations are among those that prompted this court, in *Alex*, *supra*, to reject a harmless error analysis in connection with a challenge to the discriminatory exercise of peremptory challenges pursuant to *Batson/Edmonson*. *See Alex*, [20]05–1457 at 22-24, 951 So.2d at 155-56. They are among the considerations that prompt us to conclude that an improper appeal to racial prejudice during the presentation of evidence is not susceptible to harmless error review. The right to a fair trial that is free from improper racial implications is one that serves not only to protect the defendant from a conviction founded on prejudice, but also to protect the public's confidence in the integrity of the judicial process and the administration of justice. Where the jury is improperly exposed to an appeal to racial prejudice, the impartiality of the jury as a factfinder is compromised.

*Id.* at p. 54-55, 233 So.3d at 562-63.

In the present case, we acknowledge that the State solicited a racially charged comment from Ms. Williamson – her testimony that Defendant used a racial epithet during his attack of Mr. Jackson; therefore, the trial court should have granted Defendant's motion for mistrial. Although it was a single occurrence, our courts

have recognized that "'race is such a sensitive matter that a single appeal to racial prejudice furnishes grounds for a mistrial…." *Id.* at p. 50, 233 So.3d at 560. Accordingly, we find the trial court erred in denying Defendant's motion for mistrial, and the harmless error test should not be utilized to analyze the effect of the trial court's erroneous ruling denying Defendant's motion for mistrial based on La. C.Cr.P. art. 770(1). Defendant's manslaughter conviction must be vacated, and Defendant must be afforded a new trial. In light of this, we pretermit discussion of the remaining assignments of error and remand this matter back to the trial court for a new trial.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court, vacate Defendant's manslaughter conviction and sentence, and remand this matter to the trial court for a new trial.

**REVERSED, VACATED, AND REMANDED**